A & H TRANSP. INC., T/A SAVON GAS STA-
TIONS *v.* MAYOR AND CITY COUNCIL
OF BALTIMORE, ET AL.
(Appeal No. 1)
* * *
MARYLAND ASSOCIATION OF PETROLEUM
RETAILERS, INC., AND MAYOR AND CITY
COUNCIL OF BALTIMORE *v.* BAKER
(Appeal Nos. 2 and 3)

[No. 118, September Term, 1967.]

520

Decided *April 11, 1968*.

The cause was argued before HAMMOND, C. J., and MAR-
BURY, BARNES, McWILLIAMS and FINAN, JJ.

Appeal No. 1—*Melvin J. Sykes,* with whom was *Paul Ber-
man* on the brief for appellant.

*Clayton A. Dietrich,* Chief Assistant Solicitor, with whom
was *Joseph Allen,* City Solicitor, *Paul A. Dorf* and *Frank B.
Cahn* on the brief, for appellees.

Appeal Nos. 2 and 3—*Clayton A. Dietrich,* Chief Assistant
Solicitor, with whom was *Joseph Allen,* City Solicitor, on the
brief, for appellant Mayor and City Council of Baltimore.

*Paul A. Dorf,* with whom was *Frank B. Cahn,* on the brief,
for appellant Maryland Association of Petroleum Retailers, Inc.

*E. Thomas W. Stahl* for appellee.

Amicus curiae brief filed by George F. Rosner, (*Francis D. Murnaghan, Jr.,* and *Joseph H. H. Kaplan* on the brief) and by Robert V. Patterson (*Thomas D. Washburne* on the brief).

BARNES, J., delivered the opinion of the Court.

This is an appeal by the defendant below, Mayor and City Council of Baltimore (City), a municipal corporation, and intervening defendant below, Maryland Association of Petroleum Retailers, Inc. (the Association), a body corporate, from a decree of the Circuit Court of Baltimore City (Cardin, J.) declaring invalid and unconstitutional City Ordinance 735 which, *inter alia,* prohibits the display of any gasoline price sign other than two eight by ten inch signs affixed to a pump.[1] Further, A. & H. Transp., Inc., t/a Savon Gas Stations (Savon), a body corporate, appeals, in case of reversal by this Court, the order denying Savon's motion to intervene as a plaintiff below.

Ordinance 735 was approved by the City on February 14, 1966, and on April 12, 1966, Gordon J. Baker (Baker), plaintiff below, filed a bill of complaint naming the City and the act-

---

1. Enactments similar to Ordinance 735 have been considered in other states. Although the scope of judicial review of legislative actions is not always the same, most courts have found the enactments invalid. State v. Miller, 126 Conn. 373, 12 A. 2d 192 (1940); State v. Hobson, 7 Ter. (Del.) 381, 83 A. 2d 846 (1951); Miami Springs v. Scoville, 81 So. 2d 188 (Fla. 1955); City of Lake Charles v. Hasha, 238 La. 636, 116 So. 2d 277 (1959); Sears Roebuck & Company v. City of New Orleans, 238 La. 936, 117 So. 2d 64 (1960); State v. Union Oil Company, 151 Me. 438, 120 A. 2d 708 (1956); Levy v. City of Pontiac, 331 Mich. 100, 49 N. W. 2d 80 (1951); Regal Oil Company v. State, 123 N.J.L. 456, 10 A. 2d 495 (1939); Moreson v. Akron, 20 Ohio Ops. 298, 34 Ohio L.Abs. 24 (1941); Gambone v. Commonwealth, 375 Pa. 547, 101 A. 2d 634 (1954); State v. Guyette, 81 R. I. 281, 102 A. 2d 446 (1954); Pride Oil Company v. Salt Lake County, 13 Utah 2d 183, 370 P. 2d 355 (1952). *Contra:* Slome v. Godley, 304 Mass. 187, 23 N. E. 2d 133 (1939); Merit Oil Company v. Director, 319 Mass. 301, 65 N. E. 2d 529 (1946); People v. Arlen Service Stations, 284 N. Y. 340, 31 N. E. 2d 184 (1940); People v. Bluestein, 284 N. Y. 800, 31 N. E. 2d 924 (1940). See note, 89 A.L.R.2d 901 (1963).

ing Police Commissioner as defendants, praying a declaration that the ordinance be declared unconstitutional, and praying an injunction against its enforcement pending determination on the merits. After demurrers were overruled and the Association obtained an ex parte order allowing its intervention, Baker testified that he was a lessee operator of a gasoline service station and that on or before February 14, the day the ordinance was enacted, he had large signs advertising the sale of gasoline. Baker testified that following the passage of the ordinance he removed his signs and as a result immediately lost a great volume of business and was placed in a financially precarious position. He stated that the business is very competitive, that once the customer is in the station buying gasoline he has a chance to service under the hood and thus perhaps sell a fan belt, generator, etc., if it is needed, and that a sign visible from the road stating a price for gasoline that is attractive to the motorists is important in getting his customers into his service station.

Ordinance 735, challenged here, is in part as follows:

"Section 1. *Be It Ordained by the Mayor and City Council of Baltimore,* That Section 49 of Article 15 of the Baltimore City Code (1950 Edition), title 'Inspections, Weights, and Measures,' subtitle 'Petroleum Products,' be and it is hereby repealed; and that a new Section 49 be and it is hereby ordained in lieu thereof, to stand in the place of the section so repealed and to read as follows:

"49. (a) The City Council finds that the preservation of the natural beauty of Baltimore City requires the limitation of signs advertising prices of motor vehicle fuels at places dispensing fuels in Baltimore City. Such limitation will equally serve to protect the safety and recreational value of public travel on streets in the City and will better protect the public investment in its streets and highways. In furtherance of these purposes, the following limitations are enacted.

"(b) Every retail dealer in motor fuel shall publicly display and maintain on each pump or other dispensing device, from which motor fuel is sold by him,

at least one sign and not more than two signs stating the price per gallon of the motor fuel, the State and Federal taxes, and the total price, sold by him from such pump or device. Said sign or signs shall be of a size not larger than eight inches by ten inches. The price shown on each of such signs shall include an itemization of the cost per gallon of said motor fuel, the amount of Federal taxes and the amount of state taxes. All figures, including fractions, upon said signs, other than figures and fractions used in any price computing mechanism constituting a part of any such pump or dispensing device, shall be of the same size.

"(c) No signs stating or relating to the prices of motor fuel, and no signs designed or calculated to cause the public to believe that they state or relate to the price of motor fuel, other than the signs referred to in subsection (b) of this section and required to be displayed upon pumps and other dispensing devices, shall be posted or displayed on or about the premises where motor fuel is sold at retail, and within the view of any public highway or reservation.

"Section 2. *And Be It Further Ordained,* That this ordinance shall take effect from the date of its passage.

THEODORE R. McKELDIN,
Mayor of Baltimore City.

Approved Feb. 14, 1966."

In spite of the purposes set out in section (a), *supra,* most of the defendants' testimony tends to establish a situation not mentioned in the ordinance which the defendants argue the City meant to deal with by the passage of the ordinance.[2] There was

---

2. The courts look, when a legislative action is challenged, to any set of circumstances that may justify the action. State v. Seney Company, 134 Md. 437, 448, 107 A. 189, 193 (1919); see McGowan v. Maryland, 366 U. S. 420, 81 S. Ct. 1101, 6 L. Ed. 2d 393 (1961). No argument has been made here or in the lower court that the rule should be otherwise when the legislative body specifically sets out certain purposes in an ordinance and no others, and we express no opinion on this point.

some testimony by defendants' seven witnesses, who either were or had been gas station operators, that the price signs they had used were eye sores, had often been placed on public property, and had on occasion interfered with the vision of motorists leaving the stations. Most of the testimony, however, tended to show that the signs advertising the price of gasoline were often supplied, at less than cost, by the large refining companies that supplied the gas being sold at a particular station and that the prices reflected on these signs were often determined by the pricing policies of the refining company. The refining companies were able to have their suggested prices in effect, the testimony shows, by pressuring the retailers through their rebate policies on the wholesale price of gasoline and by threatening not to renew lessee retailers' annual leases for the service stations unless prices were kept in line with the suggested price. The defendants' witnesses agreed that the refining companies were responsible for "gas wars," that the gas wars were harmful to the retailers and that they may be forced to sell gas at less than cost, that they were forced to meet a lower price of a competitor either by the refining company's pressure or the pressure of the public in refusing to buy at a price higher than that of a competitor, and that the gas wars could not be carried on without the use of large gasoline price signs visible from the road. One of the defendants' witnesses stated that there had been a twenty-eight percent decrease in gasoline business failures since the ordinance went into effect and that there had been no gas wars. There was further testimony that normal competition between retailers continues to exist, but no specific instances were given. On cross-examination it appeared that there had been no price changes since the ordinance went into effect save for increases to reflect increases in the wholesale price of gasoline.

Savon, a well known discount gasoline service station dealer, sought to intervene as a party plaintiff more than a week after all of the above testimony had been taken immediately upon being advised that the State's Attorney intended to *nol pros* the criminal case in the Criminal Court of Baltimore against Harry Waller, President of Savon, for violation of the ordinance, and thus deny Waller the opportunity to make a record with respect

to the ordinance's validity.[3] Although Savon is satisfied with the judgment below, it points out that if it had been allowed to intervene it would have introduced as evidence:

"(a) numerous photographs of instances in Baltimore City of gasoline station signs and signs of other businesses other than price signs which are at least as 'offensive' in size and placement to the gasoline price signs which were the sole target of the Ordinance.

"(b) numerous photographs of gasoline station signs and promotional displays other than price signs which are larger and more garish than the gas price signs of the type generally in use before the passage of the Ordinance.

"(c) papers from the file of the City Council of Baltimore bearing on the illegality of the Ordinance under the anti-trust laws referred to in the opinion below at E. 140-141, including a letter from The Maryland Association of Petroleum Retailers, Inc. signed by its president, Al Collins, and addressed to Mayor Mc-

3. In this Court, George F. Rosner (Rosner) and Robert V. Patterson (Patterson) have filed a brief as *amici curiae*. Rosner is the successor of Robert L. McConnell, Jr. in the operation of a Hess Oil service station, and Patterson is the successor of Harry L. Humphries in the operation of a Sun Oil service station, both of whom were criminally charged for violation of the ordinance but whose prosecutions were *nol prossed* after the testimony had been taken in the instant case. Amicus Rosner, who sells motor fuel at a lesser price than that sold by the large nationally known gasoline companies, claims that his gas is of the same quality as the nationally known companies, that he does not have the benefit of a national advertising program or the public's familiarity with his product as a household word, but must rely on bringing the quality and price of his gasoline to the public's attention solely through the use of advertising signs on his premises. Amicus Patterson wishes to display signs relating to the price of his motor fuel, allowing him to advertise his lower priced "190" grade, points out that he dispenses eight grades from a single pump, and under the ordinance which requires "an itemization of the cost per gallon * * *, the amount of Federal taxes and the amount of state taxes" and a "total" figure would be required to list 32 different sums on a sign "not larger than eight inches by ten inches."

Keldin. This letter points out that the Association's membership of '800 small businessmen' are 'the sponsors of this Bill;' that 'as dealers * * * in our search for a solution' to the economic problems of gasoline dealers 'working with our legal counsel (Paul A. Dorf, Esquire) we drafted this Ordinance.' In his argument for the Ordinance, Mr. Collins states 'We frankly admit that with the elimination of price signs it will help to stabilize the economics of the service station retailer. We are *not* against competition, but we realize we must make a fair profit in order to be sound businessmen.' (Emphasis in original.)

"(d) minutes of meetings and correspondence of The Maryland Association of Petroleum Retailers, Inc., which counsel believe will further show the anti-trust, anti-competitive, and price-fixing conspiracy tainting the Ordinance.

"(e) the text of the opinions of Judges Byrnes and Schnauffer in earlier *nisi prius* cases invalidating similar legislation.

"(f) the written opinion of the City Solicitor of Baltimore questioning the validity of the purported esthetic purposes of the Ordinance and declining to express an opinion as to the validity of the Ordinance based upon the purported legislative findings as to esthetics and to City beautification.

"(g) expert testimony as to the statistics and market data before and after the passage of the Ordinance indicating the effect of the Ordinance in stifling price competition and similar testimony as to the role and effect of price signs in gasoline marketing and service station operations.

"(h) evidence as to the increase after passage of the Ordinance of non-price signs, promotions, displays, games, special offers, premiums, etc. by Baltimore City gasoline service stations (all but a very small number of whom are claimed by the Association as members) and the consequent increase in the total number of signs and uglification of gasoline stations as deal-

ers proliferated other signs to distract the attention of customers after the only sign the customer is really interested in was prohibited by the Ordinance.

"(i) direct testimonial evidence of one or more dealers who refused to join the association's program, of the approaches made to them by association officers, which were frankly on the sole basis of promoting horizontal price fixing at a figure determined by the Association."

The Chancellor, in the memorandum opinion filed in the lower court declaring the ordinance invalid, pointed out that, if the grounds for adoption of the ordinance are that the signs are at times placed on public ways, or may block the vision of motorists, or that it is necessary to keep refining company representatives from physically entering the premises of a retailer and changing the figures on the signs, there are existing remedies for these problems. Cases are cited to show that if signs are placed so as to constitute a hazard, that action can be enjoined and that injunctive relief can be sought if trespasses are of a continuing nature. Further, Article 19, section 142 and Article 1, section 39 of the Baltimore City Code (1966 ed), it is noted, provide that every occupant of any premise is required to keep the sidewalk bounding upon his premises open and free from obstruction and that signs that overhang walkways or public property are a violation of the Code.

The Chancellor also was of the opinion that if the justification for the ordinance was esthetic considerations, the singling out of gasoline price signs was an arbitrary classification (it also noted concern on these grounds as to some other purposes for the ordinance), since other gasoline station signs are permitted as are "myriads of larger signs, billboards and other displays of other businesses than gasoline stations which mar the beauty of the city more than gasoline price signs."

As to the alleged unfair trade practices by the refining companies the Chancellor noted that:

"The evidence to support the contentions is unsatisfactory. The witnesses were highly partisan, and presented a few isolated instances of alleged pressure by

major oil dealers. There were no competent economic studies, and no valid general market data but only vague, conclusory, unsubstantiated statements that major dealers use price signs to stimulate price wars, or to force prices upward, as the case may be."

Further, in another paragraph, the Chancellor stated:

"The Ordinance makes it virtually impossible for a customer to shop for the best price, because it precludes him from knowing price differentials in the absence of minute and burdensome inquiry. The Ordinance does not proscribe sales below cost, or special forms of price competition detrimental to the public, but outlaws the only effective instrument by means of which *any* meaningful price competition can exist at all in the market." (Emphasis in original).

Finally, the Chancellor was of the opinion that, although it was unnecessary to decide if the members of the Association (the ordinance passed, the Chancellor thought, as a result of their efforts) had been engaged in activity prohibited by the federal anti-trust laws,[4] the ordinance was in conflict with those laws.

It has long been settled in Maryland that, in the exercise of its police power, the legislature has broad discretion in determining what the public welfare requires and what remedies are appropriate for the protection and promotion of that determination. *Md. Coal Etc. Co. v. Bureau of Mines,* 193 Md. 627, 636, 69 A. 2d 471, 474 (1949); *Davis v. State,* 183 Md. 385, 397, 37 A. 2d 880, 887 (1944). See *Barnes v. State,* 236 Md. 564, 577, 204 A. 2d 787, 794 (1964). The courts will not pass on the wisdom of an ordinance, *McBriety v. Baltimore City,* 219 Md. 223, 233, 148 A. 2d 408, 415 (1959); *Grossfield v. Baughman,* 148 Md. 330, 338, 129 A. 370, 373 (1925), whether it was passed to protect the vision of motorists or intended to pro-

4. It is suggested in Note, *Application of the Sherman Act to Attempts to Influence Government Action,* 81 Harv. L. Rev. 847 (1968), that activity seeking to influence legislation is not in violation of the Sherman Act.

tect retailers from the rigors of gas wars, and an ordinance is not invalid merely because there are other remedies to accomplish the same ends. See *Md. Coal Etc. Co. v. Bureau of Mines, supra; Davis v. State, supra.*

The function of the courts is, however, to ascertain whether an ordinance exceeds constitutional limits. *McBriety v. Baltimore City, supra; Tighe v. Osborne,* 149 Md. 349, 359, 131 A. 801, 804 (1925). These limits are not exceeded under the due process clauses of the Maryland and Federal Constitutions unless the party challenging the ordinance can show that it is arbitrary, oppressive, or unreasonable. *LaRoque v. County Commissioners,* 233 Md. 329, 337, 196 A. 2d 902, 906 (1964); *Davis v. State, supra.* The determination of arbitrariness, oppressiveness, and unreasonableness, although not always so stated, is necessarily the product of a weighing process (see *Pocomoke City v. Standard Oil Co.,* 162 Md. 368, 159 A. 902 (1932), where Judge Offutt notes, at 162 Md. 374, 159 A. 904, that "the nature and extent of that [police] power is not susceptible of precise definition, nor reducible to any exact formula, but must rather be gathered from its application to the varying facts of actual cases as they arise"), with all doubt being resolved in favor of the validity of the ordinance. *Pitts v. State Bd. of Examiners,* 222 Md. 224, 227, 160 A. 2d 200, 201 (1960); *Harrison v. State,* 22 Md. 468 (1864).[5] Bearing in mind that the determination by the legislature of the scope and extent of the situation it is attempting to alter is largely controlling here—see *Dundalk Liquor Co. v. Tawes,* 201 Md. 58, 62, 92 A. 2d 560, 561 (1952)—what is such scope and extent in the present case? To what extent are various rights harmed by the particular remedy chosen by the legislature? The courts

---

5. The rule that action of a legislative body will not be declared unconstitutional in a doubtful case has roots as far back as Com. v. Caton, 4 Call. 5 (Va. 1782), and has remained the rule in spite of such ingenious arguments as that advanced by Daniel Webster arguing The Charles River Bridge Case, 7 Pick. 344 (Mass. 1829). See Thayer's, *The Origin and Scope of the American Doctrine of Constitutional Law,* read before the Congress on Jurisprudence and Law Reform at Chicago in 1893, printed at 3 Harv. L. Rev. 129 (1893).

may well be in a better position than the legislature to make this determination since they are considering the effect of an ordinance in a particular case—see *Theatrical Corp. v. Brennan,* 180 Md. 377, 388, 24 A. 2d 911, 917 (1942), noting that the court only has power to decide a constitutional question if the point is raised in the case before it. If the chosen remedy is particularly harmful, are there other effective less restrictive methods available to the legislature? These are some of the considerations involved. This determination of arbitrariness, oppressiveness and unreasonableness must, of course, be made in light of the broad discretion given the legislature in the exercise of its police power, mentioned above, and cannot be a substitution of the courts' judgment for that of the legislative body. *Bosley v. Hospital for Consumptives of Maryland,* 246 Md. 197, 203-04, 227 A. 2d 746, 750 (1967); *Marcus v. Montgomery Council,* 235 Md. 535, 541, 201 A. 2d 777, 780-81 (1964).

We cannot determine, from the wording and form of the Chancellor's opinion, if the Chancellor properly applied the above test in this case. As previously noted, the fact that other remedies are available to carry out a particular legislative intent is not controlling, but only one of the questions that may be relevant. It is our opinion that the effect of the ordinance on advertising and price competition is most important to this case (see cases outlined at 89 A.L.R.2d 905 invalidating enactments prohibiting the advertising of prices by barbers—but see *Davis v. State, supra,* holding that a statute prohibiting advertisement by a physician or surgeon is a valid exercise of the police power), but it is unclear whether the Chancellor found from the evidence that all meaningful price competition was outlawed by the ordinance or took judicial notice of the effect of the ordinance. Judicial notice is appropriate in cases where facts are self-evident and notorious, *Macht v. Hecht Co.,* 191 Md. 98, 102, 59 A. 2d 754, 756 (1958), but this is not one of those cases. We also think that the Chancellor should consider not only the availability of alternative ordinances, such as ordinances proscribing sales below cost to protect retailers of gasoline, but also in the weighing process generally outlined above, should consider the administrative feasibility of such alternatives.

We do agree with the Chancellor that the evidence in this case is vague and that competent economic studies, expert testimony, and market data are lacking. The case must be remanded and we are of the opinion that it would be appropriate to take further testimony so that a constitutional question will not be decided without a full record. Rule 871 a. See Justice Brandeis' opinion for the Supreme Court of the United States in *Hammond v. Schappi Bus Line*, 275 U. S. 164, 171-72, 48 S. Ct. 66, 72 L. Ed 218 (1927), remanding for a fuller record so that there could be a better determination of important constitutional questions.

We need not decide if the Chancellor erred in denying appellant Savon's motion to intervene since the case is to be remanded for further proceedings. We are of the opinion that intervention would now be appropriate, but we express no opinion in regard to the admissibility of all of the evidence that it appears Savon may seek to offer. (See the testimony above set forth that Savon would have produced if its original motion to intervene had been granted.)

The Chancellor indicated in the opinion filed in the lower court that in attempting to carry out certain purposes, the ordinance may make an arbitrary classification in that it does not apply to other service station signs or price signs of other businesses. We will express no opinion on this point since the Chancellor may decide, as a result of further consideration after additional testimony is taken, that the ordinance can stand as a remedy to a situation not subject to this attack. This Court will not anticipate a constitutional question. *Middleman v. Md. Nat. Comm.*, 232 Md. 285, 289, 192 A. 2d 782, 783 (1963) ; *Jeffers v. State*, 203 Md. 227, 230, 100 A. 2d 10, 11 (1953).

The Chancellor found that the ordinance restricts competition, thus conflicts with the federal anti-trust laws, and must fall as a result of the supremacy clause of the Constitution of the United States. See *Schill v. Remington-Putnam*, 182 Md. 153, 161-62, 31 A. 2d 467, 470-71 (1943). We express no opinion on this point. As stated above, it is not clear whether the Chancellor found from the evidence that competition was restricted or took judicial notice of the ordinance's effect. The

532

finding could be different on an expanded record. *Middleman v. Md. Nat. Comm., supra; Jeffers v. State, supra.*

> *Case remanded without affirmance or reversal for further proceedings in accordance with this opinion, the costs in the lower court and in this court to abide the result in the lower court.*