## STATE'S ATTORNEY FOR CHARLES COUNTY, ET AL. *v.* TRIPLETT, ET AL.

[No. 364, September Term, 1968.]

*Decided October 14, 1969.*

The cause was argued before HAMMOND, C. J., and MARBURY, BARNES, MCWILLIAMS, FINAN, SINGLEY and SMITH, JJ.

*Thomas N. Biddison, Jr., Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General,* and *S. Leonard Rottman, Assistant Attorney General,* on the brief, for appellants.

*Joseph H. Sharlitt,* with whom was *Edwin R. Schnieder, Jr.,* on the brief, for appellees.

BARNES, J., delivered the opinion of the Court.

In this appeal the constitutionality of Chapter 465 of the Acts of the General Assembly of Maryland of 1968, now Article 56, Section 144A of Code (1957) (the Act), to ban the use of games, contests and other means of promoting business or product of or relating to the sale of motor vehicle fuels in which prizes, gifts or gratuities are given or determined by chance is challenged. A suit in the Circuit Court for Charles County was filed on July 2, 1968, by those individuals who sell gasoline at retail in Maryland and by a corporation engaged in the wholesale distribution of gasoline and related products against John C. Hancock, State's Attorney for Charles County and others, seeking declaratory relief as well as injunctive relief against the enforcement of the Act. The Chancellor (Bowen, J.) on December 16, 1968, granted the Plaintiffs' Motion for Summary Judgment declaring the Act unconstitutional and entered a judgment in their favor for $.01 damages, but required the Plaintiffs to pay the costs.[1] An order of appeal was timely entered upon the judgment on January 2, 1969.

The Act, which was Senate Bill 350 in the 1968 Session of the General Assembly and signed by the Governor on May 7, 1968, is as follows:

"AN ACT to add new Section 144A to Article 56 of the Annotated Code of Maryland (1964 Replacement Volume), title 'Licenses', subtitle

---

1. Inasmuch as the suit was in equity the proper practice would have been to enter a written order or decree making the declaration of unconstitutionality, either granting or denying the injunction prayed for and requiring the plaintiffs to pay the costs. Although motions for summary judgment may in appropriate cases be used in equity suits—see *Burrell v. Frisby*, 212 Md. 181, 129 A. 2d 75 (1957)—the relief when summary judgment is granted in equity cases should be fashioned in a written order or decree in accordance with the relief prayed for in the bill of complaint and not merely entered upon the docket as if the equity suit were an action at law as was done in the present case. The appellants, however, raised no point in regard to this irregularity and we will treat the docket entries as if they were a formal order or decree granting the relief indicated by those docket entries.

'Motor Vehicle Fuel Tax', to follow immediately after Section 144 thereof to ban the use of games, contests and other means of promoting business or product of or relating to the sale of motor vehicle fuels, whereby prizes, gifts or gratuities are offered or given or determined by chance whether or not a purchase is required to participate in the game or contest.

"SECTION 1. Be it enacted by the General Assembly of Maryland, That new Section 144A be and it is hereby added to Article 56 of the Annotated Code of Maryland (1964 Replacement Volume), title 'Licenses', subtitle 'Motor Vehicle Fuel Tax', to follow immediately after Section 144 thereof and to read as follows:

"144A.

"Any dealer or seller who dispenses and/or sells motor vehicle fuel in this state shall not engage in, promote, or in any way operate or perform any contest or game, by or through the use of any scheme or device which for the purpose of promoting, furthering or advertising any business or product, whereby a person or persons may receive gifts, prizes or gratuities as determined by chance and the fact that no purchase is required in order to participate in the contest or game does not exclude such contest or game from the provision of this Article.

"SEC. 2. And be it further enacted, That this Act shall take effect July 1, 1968."

In support of their Motion for Summary Judgment, the plaintiffs and appellees filed four affidavits, i. e., of Harlan Triplett, Lemuel R. Green, James L. Curley and James A. Wise. They also filed a copy of the Hearings Before the Subcommittee on Activities of Regulatory Agencies of the Select Committee on Small Business of the House of Representatives of the Ninetieth Congress of the United States, held June 20 and July 11, 1968, in

regard to the use of games of chance in gasoline market-
ing and their impact upon small business (House Sub-
committee Hearings).

The affidavits of the plaintiffs Triplett and Curley and
of Green may be summarized as follows:

Triplett and Curley sell gasoline to the public. They
also sell to the public at their gasoline service stations
various non-gasoline products, such as tires, batteries,
automotive accessories, replacement parts, soft drinks,
cigarettes, candy, sandwiches, bread and other products
customarily marketed by some gasoline stations. Their
sales of products other than gasoline account for ap-
proximately 20% to 25% of their total gross sales. They
used promotional games of chance in order to promote
their businesses and their products, both gasoline and
non-gasoline, prior to July 1, 1968. They used these pro-
motional games of chance because they believed that
such legal games would help them increase their sales
of all products sold by them to the public, and they found
that these games helped to increase their sales of all
products. Members of the public would often come to
their stations to play one of the games (no purchase was
necessary in order to play the games) and they would
be able to sell such persons a tire or a battery or a simi-
lar product. They discontinued the games on July 1, 1968,
(when the Act became effective) because they feared
criminal penalties and they have experienced losses in
their gross sales since that time, Triplett's gross sales
having declined on the average of $50 per day and some-
times as much as $100 per day and Curley's gross sales
having been reduced by approximately 10%.

They compete with other retailers in the sale of their
products and in regard to their non-gasoline products
they compete with others who do not sell gasoline. Trip-
lett competes with a Western Auto Store approximately
one-half mile from his station, which sells almost every-
thing he sells except gasoline. Curley competes with at
least three stores in Waldorf which do not sell gasoline
but do sell tires. The competing retailers are free to use

promotional games to promote their businesses and to promote products in direct competition with the non-gasoline products sold by Triplett and Curley, the Act preventing them from using such games.

The affidavit of Green, with its attached exhibits, indicates that the use of promotional games involving chance is widespread throughout the State of Maryland both for the promotion of the entire business by the retailer and for the promotion of products by the manufacturer. A number of specific non-gasoline products sold in Maryland, the sales of which are promoted by the use of games involving chance, are set forth together with copies of magazine advertisements indicating the nature of the games for the various non-gasoline products.

The affidavit of Wise indicates that he is a member of the Maryland Bar practicing law in Denton, Maryland. He was employed in February, 1968 by a client as a legislative representative before the 1968 Session of the General Assembly to oppose the passage of Senate Bill 350 (which later became the Act) and duly registered as a legislative representative of his client for that purpose. He found that the bill had already been favorably reported by the Senate Committee on second reading and was ready for passage by the Senate of Maryland. It passed the Senate on March 6, his inquiry revealing that it had received little notice and practically no opposition. In the House of Delegates, the bill was referred to the Consumer Affairs Subcommittee and at the hearing before the Subcommittee on March 12, the affiant was in charge of the presentation of the opposition to the bill. The testimony of the proponents of the bill was that it should be passed for the following reasons:

> "1. The games deceived the public and were subject to rigging.
> 2. Retailers were coerced by their suppliers, the oil companies, into purchasing these games.

276

3. The customers did not really want or like the games, and they were not worth the trouble.
4. The games were a form of gambling and thus offensive.
5. Profits of retail gasoline dealers had been reduced by the games and gasoline prices had been raised in some instances because of the games."

The affiant followed the proposed legislation closely and the reasons above stated were the only public purposes he knew of which were considered by the General Assembly in its deliberations in regard to the bill.

All of the affidavits noted that the respective affiants were competent to be witnesses and had personal knowledge of the facts stated in the respective affidavits.

The House Subcommittee Hearings consisted of some 394 pages of testimony, 29 pages of which (pages 82 to 111) are concerned with the use of games of chance in gasoline marketing and their impact upon small business in Maryland. In addition to the testimony of A. L. Collins, then president of the Maryland Association of Petroleum Retailers, Inc. (the Association), of Mrs. Mildred Trostle, wife of an Esso dealer and a vice-president of the Association, and of Rex Wright, a dealer in the petroleum industry in Baltimore, numerous documentary exhibits were introduced into evidence before the Subcommittee. These documentary exhibits consisted principally of formal statements of Mr. Collins and Mrs. Trostle, letters to then Governor Agnew, to the Attorney General of Maryland, to State's Attorneys, to State Senators and to representatives of certain oil companies. There were also copies of various articles in the press in regard to Senate Bill 350, as well as in regard to Senate Bill 81 which would have added a new Section 40A to Article 27 of Code (1957) to prohibit any contests or games used for the purpose of promoting or advertising a business or product whereby any gifts, prizes or

gratuities are awarded and the persons receiving the gifts, prizes or gratuities are determined by chance. Copies of both Senate Bills 81 and 350 were introduced into evidence before the House Subcommittee.

Interesting comments in an article issued by the Annapolis Bureau of The Sun on March 22, 1968, in regard to the passage of Senate Bill 350 by the House of Delegates were as follows:

> "Gasoline station promotional games will be banned in Maryland after June 30 under a bill enacted today by the General Assembly.
>
> "Among those who had pushed for passage of the measure, by Senator James Clark (D., Howard-Montgomery), were gas station operators handling the products of major oil companies.
>
> "They contended that the games are rigged, that they are forced on operators by the companies, and that they cost the motoring public at least a penny a gallon extra for their gasoline.
>
> "During the 40-minute House debate that preceded the 119-9 final approval of the bill, which now goes to Governor Agnew for his signature, several delegates told of committee 'demonstrations' in which station operators picked from among supposedly foolproof, sealed envelopes the winning tickets.
>
> "What opposition there was to the measure came from delegates who wanted to extend the ban to supermarket and other merchants' giveaway promotional games.
>
> "The 'Tigerino' bill, as it has been dubbed by legislators, has no punitive clause. However, lawyer-legislators said that once the bill gets on the books, any taxpayer can go to court and demand an injunction to stop them."

The defendants in their answer generally denied the facts alleged, neither admitted nor denied the conclusions

of law alleged, but admitted the allegations that the plaintiffs would be subject to criminal penalties if they violated the law. Although the defendants filed no affidavits in opposition to the motion of the plaintiffs for summary judgment, they filed an answer to that motion in which they alleged that there was a genuine dispute between the parties in regard to material facts as follows:

> "a. The intent of the General Assembly of Maryland, in adopting Chapter 466 of the Laws of Maryland of 1968.
> b. The need for the legislation adopted to regulate an evil existing in the State of Maryland.
> c. The availability of other remedies to regulate the evil existing in the State of Maryland intended to be obviated by the adoption of Chapter 466 of the Acts of 1968.
> d. The nature of the relationship existing between dealers and sellers of gasoline to their suppliers."

Both before the Chancellor and before us, the plaintiffs and appellees raised and argued three principal grounds indicating the unconstitutionality of the Act. These were:

1. The Act denies the plaintiffs due process of law contrary to Article 23 of the Declaration of Rights of the Maryland Constitution and the Fourteenth Amendment to the Constitution of the United States as being vague, indefinite, confusing and incomprehensible.

2. The Act denies the plaintiffs due process of law because it is arbitrary, unreasonable and capricious and no conceivable legislative purpose could justify it.

3. The Act denies the plaintiffs the equal protection of the laws as prohibited by the Fourteenth Amendment as it unreasonably discriminates against one class of retailers.

The Chancellor declined to hold that the Act was unconstitutional because it was too vague or indefinite or

that it was unenforceable because of vagueness in the penalty section of Article 56 of the Code. The Chancellor, however, was of the opinion that the language of the Act *as it appeared in the body of the Act* was arbitrary, unreasonable and discriminatory and denied the plaintiffs due process of law and the equal protection of the laws. In his oral opinion, the Chancellor stated in part as follows:

> "Now, as the Attorney General argues, and everyone agrees, the evil sought to be prohibited here by the legislature was solely and only the promotional give-away or gambling games, originated by the manufacturers and distributors of gasoline or other related motor vehicle fuel products, and carried on by them through their dealer outlets. Manifestly, it was not the intention of the legislature to ban these promotional give-away programs that are run by the flour companies, the soap companies, the tire companies, and other large nationally-known brand manufacturers, who from time to time as a promotional scheme run a contest or a give-away program, based on Social Security numbers, or automobile tag numbers, or any of the other items of chance that they sometimes select to determine who will participate in their prize."
>
> * * *
>
> "The all-encompassing language of the statute which prohibits a gasoline dealer from using such a scheme to promote, further or advertise 'any business or product' really meant to say 'from advertising for the purpose of promoting, furthering or advertising the sale or distribution of motor vehicle fuel.' It is the give-away promotional schemes in motor vehicle fuel that the legislature sought to correct by this statute, as the Attorney General represents, and as is manifest in the history of the legislation.

"To include along with that all of the other items in a statute dealing solely and only with filling stations we think is manifestly unconstitutional. If the legislature had designed to do away with all such programs, then they should have, we think, to provide equal protection of all of the class, and the class here, if we are dealing with all give-away programs, is all retailers, any dealer or seller at retail, makes the law apply equally to everyone; or, conversely, any dealer or seller dispensing motor vehicle fuel is prohibited from promotional schemes designed to promote or further the business or products sold for motor vehicle fuel.

"For these reasons, Gentlemen, the Court concludes that the Statute as drawn was so narrow in the class it deals with, and so broad in the acts which it proscribes as to constitute an arbitrary, unnecessary and unreasonable exercise of the legislature's undoubted right to regulate gambling, and to regulate business practices which are unfair, unhealthy or improper for the economic welfare of the State. And for these reasons, Gentlemen, the Court will grant the motion for summary judgment prayed in the amended bill of complaint, declaring that Section 144A of Article 56 of the Code is unconstitutional."

It will be observed that the Chancellor did not consider or refer to the title to the Act and the title to the Act was not referred to in the briefs of the respective parties. This Court, however, did raise the question of the effect of the more restrictive title to the Act at the argument and we are of the opinion that this is an important question in the case.

A comparison of the language of the title of the Act with that appearing in the body of the Act will disclose that the former is far more restrictive than the latter.

In the title the important language is "* * * to ban the use of games, contests and other means of *promoting business or product of or relating to the sale of motor vehicle fuels * * *"* whereas in the body of the Act the language is "Any dealer or seller who dispenses and/or sells motor vehicle fuel * * * shall not engage in, promote, or in any way operate or perform any contest or game * * * *for the purpose of promoting, furthering or advertising any business or product,* whereby a person * * * may receive gifts * * *." (Emphasis supplied) It will be noted that after the words "any business or product" in the body of the Act, the words "of or relating to the sale of motor vehicle fuels" which appear in the title *do not appear,* so that the language of the body of the Act literally appears to apply to games promoting *any* business or product sold by a dispenser or seller of motor vehicle fuel whether or not such a sale is "of or relating" to the sale of motor vehicle fuel, and, this would ordinarily be the effect of the broad language of the body of the Act, unless it could be said *by implication* the prior language describing the dealer or seller limits the general language "any business or product." The Chancellor was of the opinion that the broad language "any business or product" applied to all products sold by a dealer or seller of motor vehicle fuels whether or not such a sale was of motor fuel or related to such a sale. But for the language of the title to the Act (which as we have indicated was not considered by him or brought to his attention by counsel), we would be inclined to agree with his construction of the language of the body of the Act.

Our predecessors, however, have held that Article III, Section 29 of the Maryland Constitution which provides, *inter alia,* that the subject of an Act of Assembly be described in its title, requires that a restriction in the title of the Act must either confine the operation of the Act to conform to that restriction if that construction is possible or, if such a construction is not possible, render the Act void to the extent of the conflict between the re-

striction in the title and the provisions in the body of the Act. *Buck Glass Co. v. Gordy,* 170 Md. 685, 185 A. 886 (1936). In *Buck Glass,* the plaintiff manufactured glass bottles which it sold in large quantities to sellers of beer and milk. The emergency gross receipts tax provided by the Acts of 1935, Chapter 188 imposed a tax according to its title "for the privilege of engaging in the business of selling tangible personal property *at retail*" whereas that act contained in its body an explicit definition that *all sellers* of goods in whatever quantities were taxed (Emphasis supplied). This Court held that because of the restriction in its title, the statute could not properly be interpreted to include among the sellers to be taxed, producers or dealers in gross quantities because they were selling at wholesale and not *at retail* as provided in the title. Chief Judge Bond, for the Court, stated:

> "The title does not, in words, refer to the business of selling to consumers as the subject of the tax. On the contrary, it refers only to 'the business of selling tangible personal property at retail.' Sales to consumers are specified only in the definitions and other provisions in the body of the act. So far as there may be a difference in the subject stated in the one way and the other, it is important because of the requirement of the State Constitution, article 3, sec. 29, that the subject of an Act of Assembly shall be described in its title. A title which is descriptive to some extent must go far to fix the understanding of its purpose among legislators and interested members of the public. 'Bills are sometimes read, especially the first time, by their titles only, and the titles only are spread upon the journal.' *Stiefel v. Maryland Institution for the Blind,* 61 Md. 144, 148. And it is the main purpose of the constitutional provision to prevent enactment under a misconception by reason of a misdescriptive title. 'The object of the requirement of the Constitution

is that legislators and the public may be informed by the title of the general nature of the provisions proposed to be enacted.' *Levin v. Hewes,* 118 Md. 624, 632, 86 A. 233, 235. It follows that a restriction in the title must either confine the operation of the act to conform to that description, if such a construction is possible, or render the act void to the extent of the conflict. *Scharf v. Tasker,* 73 Md. 378, 383, 21 A. 56; *Luman v. Hitchens Bros. Co.,* 90 Md. 14, 44 A. 1051; *Weber v. Probey,* 125 Md. 544, 551, 94 A. 162. In the present instance, as the title announces that the tax is one upon the business of selling at retail, or a retail sales tax, it seems probable that in the course of enactment of the law this was widely understood to be the effect of it." (170 Md. at 688-89; 185 A. at 887-888)

\* \* \*

"The court finds, then, that the Constitution of the State limits the application of the tax under the Maryland act to the subject described in the title, to the business of selling at retail, as thus interpreted. But the several definitions which extend it to manufacturers and wholesalers selling to consumers, as well as to the ordinary retailers, may have an effect within that description, and therefore are not invalid as necessarily extending beyond it. There are producers who sell their products directly to consumers at retail in the ordinary sense. Doubtless, wholesalers who are not producers may be found so engaging in retail selling as well. These, and all others selling at retail, are made subject to the tax. If it should happen in any case that more than one dealer should be selling at retail in the course of distribution of particular goods, then that one who sells to the consumer is taxed. This construction views the

definitions as having purposes within the scope of the title, and therefore effectual to that extent. And the court is of opinion that any one reading the act with its title, while it was in process of enactment, would probably have inferred that this was the intended scope of the tax." (170 Md. at 690-91; 185 A. at 888)

This Court cited *Buck Glass* with approval and followed the decision in that case in *Atkinson v. Sapperstein,* 191 Md. 301, 314, 60 A. 2d 737, 742 (1948) and in *Shipley v. State,* 201 Md. 96, 102-103, 93 A. 2d 67, 70 (1952) so that the holding in *Buck Glass* is now settled law in this State.

It is apparent that the *Buck Glass* case is quite analogous to the present case and it may well be that the broad provision "any business or product" in the body of the Act is limited in its construction and operation to "business or product of or relating to the sale of motor vehicle fuels" as set forth in the title. This construction may well be the proper one in view of the established law in Maryland, as well as elsewhere, that every presumption favors the validity of a statute and it will not be held to be unconstitutional and void unless it plainly contravenes a constitutional provision. A reasonable doubt in favor of the validity of the statute is sufficient to sustain it. As Judge Collins, for the Court, stated in *Atkinson v. Sapperstein, supra*:

"Every presumption favors the validity of a statute. It was said by this Court in *McGlaughlin v. Warfield,* 180 Md. 75, at page 78, 23 A. 2d 12, 13: 'In accordance with the great weight of authority in this country, this Court has consistently held that the purpose of the constitutional provision here invoked is sufficiently complied with if the title of the proposed legislation fairly advised the General Assembly, and the public, of the real nature, and subject matter, of the legislation sought to be accomplished,

and in testing conformity of a title of a statute to constitutional requirements that the subject should be described in the title, the Courts are disposed to uphold rather than to defeat the statute, and since every presumption favors the validity of a statute, it cannot be stricken down as void, unless it plainly contravenes a provision of the Constitution; a reasonable doubt in its favor is enough to sustain it.' Many cases are there cited to sustain this rule." (191 Md. at 315; 60 A. 2d at 742)

See also *Leonardo v. Board of County Comm.*, 214 Md. 287, 134 A. 2d 284 (1957) and *Clark's Brooklyn Park, Inc. v. Hranicka,* 246 Md. 178, 227 A. 2d 726 (1967).

If, however, the suggested construction cannot be made and if the title to the Act is deceptive, then the Act must be declared to be unconstitutional as violating Article III, Section 29 of the Maryland Constitution. See *Clark's Brooklyn Park, Inc. v. Hranicka, supra.* On the entire subject of the effect of Article III, Section 29 of the Maryland Constitution, see the interesting and helpful article by Carl N. Everstine of the Baltimore Bar, entitled "Titles of Legislative Acts" in 9 Md.L.Rev. 197 (1948).

Inasmuch as we shall remand this case without affirmance or reversal pursuant to Maryland Rule 871, as later more fully set forth, we shall not decide the effect of Article III, Section 29 of the Maryland Constitution upon the construction or validity of the Act but will leave these issues for the determination of the lower court upon the remand, when counsel for the parties will have the opportunity to brief and argue these issues possibly in the light of any additional testimony taken upon the remand.

In our opinion, the Chancellor should not have granted a summary judgment declaring the Act unconstitutional as denying due process of law and the equal protection of the law. There may be cases involving statutes where

the denial of due process of law and of equal protection of the law are clear on the face of the statutes or upon consideration of quite limited evidence, but, in our opinion, the statute involved in the present case is not of this type, especially in view of the issues arising in regard to the possible restrictive effect of the provisions of the title of the Act upon the construction of the language in the body of the Act.

We pointed out in *A. & H. Transport, Inc. v. Mayor and City Council of Baltimore,* 249 Md. 518, 240 A. 2d 601 (1968)—a case in which the lower court had held that Ordinance 735 of the Mayor and City Council of Baltimore, approved February 14, 1966, which, *inter alia,* prohibited the display of any gasoline price sign other than two eight by ten inch signs affixed to a gasoline pump, was unconstitutional and invalid for various reasons on what we considered to be an insufficient record—that "a constitutional question will not be decided without a full record." (249 Md. at 531, 240 A. 2d at 608). We also stated:

> "It has long been settled in Maryland that, in the exercise of its police power, the legislature has broad discretion in determining what the public welfare requires and what remedies are appropriate for the protection and promotion of that determination. *Md. Coal Etc. Co. v. Bureau of Mines,* 193 Md. 627, 636, 69 A. 2d 471, 474 (1949) ; *Davis v. State,* 183 Md. 385, 397, 37 A. 2d 880, 887 (1944). See *Barnes v. State,* 236 Md. 564, 577, 204 A. 2d 787, 794 (1964). The courts will not pass on the wisdom of an ordinance, *McBriety v. Baltimore City,* 219 Md. 223, 233, 148 A. 2d 408, 415 (1959) ; *Grossfield v. Baughman,* 148 Md. 330, 338, 129 A. 370, 373 (1925), whether it was passed to protect the vision of motorists or intended to protect retailers from the rigors of gas wars, and an ordinance is not invalid merely because

there are other remedies to accomplish the same ends. See *Md. Coal Etc. Co. v. Bureau of Mines, supra; Davis v. State, supra.*

"The function of the courts is, however, to ascertain whether an ordinance exceeds constitutional limits. *McBriety v. Baltimore City, supra; Tighe v. Osborne,* 149 Md. 349, 359, 131 A. 801, 804 (1925). These limits are not exceeded under the due process clauses of the Maryland and Federal Constitutions unless the party challenging the ordinance can show that it is arbitrary, oppressive, or unreasonable. *La-Roque v. County Commissioners,* 233 Md. 329, 337, 196 A. 2d 902, 906 (1964) ; *Davis v. State, supra.* The determination of arbitrariness, oppressiveness, and unreasonableness, although not always so stated, is necessarily the product of a weighing process (see *Pocomoke City v. Standard Oil Co.,* 162 Md. 368, 159 A. 902 (1932), where Judge Offutt notes, at 162 Md. 374, 159 A. 904, that 'the nature and extent of that [police] power is not susceptible of precise definition, nor reducible to any exact formula, but must rather be gathered from its application to the varying facts of actual cases as they arise'), with all doubt being resolved in favor of the validity of the ordinance. *Pitts v. State Bd. of Examiners,* 222 Md. 224, 227, 160 A. 2d 200, 201 (1960) ; *Harrison v. State,* 22 Md. 468 (1864)." (249 Md. at 528-29; 240 A. 2d at 606-7)

In our opinion, the parties should be permitted to offer evidence, otherwise admissible, upon the evils intended by the General Assembly to be suppressed by the Act, the availability of other remedies to regulate or suppress the evils intended to be regulated or suppressed by the Act and any other testimony relevant to the issues raised by the plaintiffs and appellees in regard to the

288

proper construction of the Act or its alleged unconstitutionality.

> *Case remanded without affirmance or reversal for further proceedings in accordance with this opinion, the costs in the lower court and in this court to abide the result in the lower court.*