SALISBURY BEAUTY SCHOOLS ET AL. *v.* STATE
BOARD OF COSMETOLOGISTS

[No. 78, September Term, 1972.]

*Decided February 7, 1973.*

34

The cause was argued before BARNES, SINGLEY, SMITH

and DIGGES, JJ., and WILLIAM J. O'DONNELL, Associate Judge of the Eighth Judicial Circuit, specially assigned.

*Harry S. Shapiro,* with whom were *Shapiro, Peltz & Aversa* on the brief, for appellants.

*Thomas N. Biddison, Jr., Assistant Attorney General,* with whom was *Francis B. Burch, Attorney General,* on the brief, for appellee.

O'DONNELL, J., delivered the opinion of the Court.

In 1935 the Legislature by Chapter 282 enacted twenty-six new sections to Article 43 [§§ 395-420 inclusive] of the Annotated Code under the title "Health", Sub-title "Hairdressers and Beauty Culturists." [1] The title to the Act proclaimed these sections necessary "To promote the public health and safety by providing for the examination and registration of those who desired to engage in the occupation of Beauty Culture, and to regulate the occupation of hairdressers and beauty culturists; to create a State Board of Hairdressers and Beauty Culturists for the examining and licensing of persons engaged in or teaching said practices, to secure the better education of such practitioners and to provide rules regulating the proper conduct and sanitation of hairdressing so as to prevent the spread of contagious and infectious diseases . . . ."

"Beauty Culture" was described as including: [2] ". . . any and all work done for compensation by any person, which work is generally and usually performed by so-called hairdressers, cosmetologists, cosmeticians, beauticians or beauty culturists and demonstrators of beauty preparations or equipment, and however denominated in

---

1. Codified in the Ann. Code (1939 Ed.) as Art. 43, §§ 471 ff; now codified, as amended, as Art. 43, §§ 529-555, Ann. Code (1971 Repl. Vol.).
2. See Art. 43, § 471 (a), Ann. Code (1939 Ed.); now § 529 (a), Ann. Code (1971 Repl. Vol.).

so-called hairdressing and beauty shops ordinarily patronized by women, which work is for the embellishment, cleanliness and beautification of women's hair, such as arranging, dressing, curling, waving, permanent waving, cleansing, cutting, singeing, arching of eyebrows, dyeing of eyebrows and eyelashes, bleaching, coloring, or similar work thereon and thereabout, and the removal of superfluous hair, and the massaging, cleansing, stimulating, exercising, or similar work upon the scalp, face, arms or hands, by the use of mechanical or electrical apparatus or appliances or cosmetics, preparations, tonics, antiseptics, creams or lotions or by any other means, and of manicuring the nails of either sex, which enumerated practices shall be inclusive of the term beauty culture but not in limitation thereof." [3]

Included among those enactments was a section captioned "Student Practice Upon the Public for Pay" which prohibited any school of beauty culture from making *any* charge "whatsoever for treatment by its students *or* for materials used in such treatment."

In 1947 the Legislature authorized clinical work by students, after the student had completed 500 hours of fundamental training. The section prohibiting any charge "whatsoever" for treatment by students in schools of beauty culture—the section here in controversy was amended to read as follows: "No school of beauty culture shall, directly or indirectly, charge any money whatsoever for treatment by its students and may charge only for the actual cost of materials used in such treatments, but no charge shall be made for service supplie[s] (sic)." [4]

---

3. By Ch. 704, Acts of 1947, "Electrologists"—those licensed "to remove surplus hair by means of specially designed electric needles"—were brought within the coverage of the Sub-title.
4. See Ch. 704, Acts of 1947, Art. 43, § 498, Ann. Code (1951 Ed.); Art. 43, § 537 (a), Ann. Code (1971 Repl. Vol.).
The court is persuaded that the word "supplie[s]" is typo-

In 1961 the General Assembly undertook to define a "student" as one "engaged in learning or acquiring the knowledge of the practice of hairdressing and beauty culture for tuition or fee in a duly authorized school"; it defined a "school of beauty culture" as a "premises where such instruction was given a student for tuition or fee." It discarded the mundane terms of "hairdressers and beauty culturists" by providing that wherever that terminology had been used in the statute those who pursued such a calling were thereafter to be scientifically classified as "cosmetologists." [5]

At the same session, in supplementation of the prohibition against such schools of beauty culture charging "any money whatsoever for treatment by its students," the General Assembly enacted a new section [Art. 43, § 537 (b), Ann. Code (1971 Repl. Vol.)] which provides:

> "It shall be unlawful for any school of beauty culture to advertise a list of prices for services to be performed by students other than by posting such a list within the school building."

Despite this legislative history and revision no steps were apparently taken to enforce Art. 43, § 537 (a) until March 6, 1962, when the members of a newly-constituted Board of Cosmetology, by letter, admonished the various private schools of beauty culture within the State "to reduce their clinic prices to 'cost of materials'."

The appellants, comprising fifteen (15) separate privately operated schools of beauty culture and the Maryland Association of Beauty Schools, Inc., on March 15, 1963, in the Circuit Court No. 2 of Baltimore City, filed a petition requesting that Art. 43, § 537, be declared unconstitutional and the Board of Cosmetology be enjoined from enforcing it. After a hearing the lower court (Jones, J.), on April 10, 1963, without prejudice, issued an interlocutory injunction (and maintained the *status quo*)

graphically incorrect and in view of the language and expressed intent of the section should be read as "supplie*d*."
5. Ch. 278, Acts of 1961.

against the enforcement by the Board of the statute, pending decision on the merits. See Md. Rule BB70 c.

After a demurrer on behalf of the Board had been overruled (Perrott, J.) and its Answer filed, both the appellants and the Board filed Cross-Motions for Summary Judgments—each alleging that there was "no genuine dispute as to material fact."

After a hearing on the respective motions—but before they were decided—the appellants, on January 12, 1972, filed a petition to amend their complaint and to ask, by way of alternative relief, that the court pass an order construing the phrase "the cost of materials", "so as to allow a reasonable schedule of prices to be charged by the beauty school clinics." [6]

The Chancellor (Cardin, J.) on January 17, 1972 by his memorandum and decree, denied the appellants' Motion for Summary Judgment, granted the Board's Motion and declared that the provisions of Art. 43, § 537 (a) were constitutional. At the same time, "at the request of counsel", the court retained jurisdiction over the subject-matter relating to any "schedule of prices" and referred that issue to the Board "in order that they may promulgate rules and regulations by which the 'cost of materials' may be determined."

The appellants, from the decree upholding the constitutionality of the statute, here contend: (a) that it was error for the trial court to have denied their Motion for Summary Judgment because the pleadings "established a genuine dispute as to material facts", (b) that it was error to grant the Board's Motion for Summary Judgment upon the uncontroverted facts presented by the pleadings, (c) that Art. 43, § 537 (a), limiting the charges made in beauty school clinics to "cost of materials" is unconstitutional and invalid, and (d) that the State Board of Cosmetology is estopped, or barred by

---

6. The delay in concluding the litigation was occasioned by the appellants' efforts to obtain relief by legislative action. See memorandum of Jones, J., dated December 9, 1970 (R. 18), and appellants' "Reply Memorandum" (R. 60).

laches, from enforcing the statute "by virtue of the prior rules, regulations and policy of the Board."

## (a) and (b) RULING ON MOTIONS FOR SUMMARY JUDGMENT

The appellants, in support of their contention that their Motion for Summary Judgment was improperly denied and the Board's Motion erroneously granted, contend that no allegations of facts were made by the Board attempting to controvert the allegations set forth in their petition; that the "regulations and practice of the Board should have been given weight in view of the reliance [thereon] by the beauty school industry for a period of twenty-eight years"; and that the Board had failed to controvert the appellants' allegations that they had expanded their facilities, made improvements and established new schools in reliance upon the practice authorized by the Board, nor was their allegation controverted that in the event they were limited to charging the "cost of materials", then tuition would have to be increased.

The Board, by its Answer, admitted the majority of the allegations made by the appellants, but denied that it "by its rules and regulations had allowed the schools to reflect in their charges the cost of administration and the cost of materials." It was further denied that the provisions of Art. 43, § 537, were not a valid exercise of the police power and denied that the appellants would suffer "irreparable injury." As to the remainder of the appellants' allegations, the Board pleaded that it was "without knowledge"—amounting to a denial, under Maryland Rule 372 a 2.[6a]

The appellants earnestly argue that the Answer filed by the Board established a genuine dispute as to material facts and it was thus error to grant the Board's Motion; by the same logic—though they allege the pleadings establish a genuine dispute as to material facts—they contend that they were entitled to summary relief.

6a. "Uncontroverted" facts present only a question of law. See *Alexander v. Tingle*, 181 Md. 464, 30 A. 2d 737 (1943).

40

The function of the summary judgment procedure is not to try the case or decide the issues of fact raised; it is merely to determine whether or not an issue of fact is to be tried and if there is none, to cause judgment to be rendered accordingly. *Greenwell v. American Guaranty Corp.*, 262 Md. 102, 277 A. 2d 70 (1971); *Trustees of Broadfording Church of the Brethren v. Western Maryland Railway Co.*, 262 Md. 84, 277 A. 2d 276 (1971). The purpose of the hearing on the motion, at the trial level, is to decide if a real dispute as to material facts does exist and if the pleadings, depositions, admissions and affidavits (if any) show that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law, summary judgment should be granted. *Brown v. Suburban Cadillac, Inc.*, 260 Md. 251, 272 A. 2d 42 (1971).

A bare allegation in a general way that there is a dispute as to material facts is never sufficient to defeat a motion for summary judgment. *Melbourne v. Griffith*, 263 Md. 486, 283 A. 2d 363 (1971); nor is the mere filing of an Answer to a bill of complaint necessarily fatal to a motion for summary judgment, particularly where the Answer does not warrant a finding that there is a genuine dispute as to material facts between the parties. *Burrell v. Frisby*, 212 Md. 181, 129 A. 2d 75 (1957).

Even where it is shown that there is a dispute as to a fact, when the resolution of that factual dispute is not material to the controversy, such dispute does not prevent the entry of summary judgment. *Shaffer v. Lohr*, 264 Md. 397, 287 A. 2d 42 (1972); *S. L. Hammerman Organization, Inc. v. Community Health Facilities, Inc.*, 264 Md. 37, 50, 284 A. 2d 599, 605 (1971); *Meola v. Bethlehem Steel Co.*, 246 Md. 226, 239-40, 228 A. 2d 254, 262 (1967); a dispute as to facts relating to grounds upon which the decision is not rested is not a dispute with respect to a *material* fact and such dispute does not prevent the entry of summary judgment. *Daniel v. Kensington Homes, Inc.*, 232 Md. 1, 13, 192 A. 2d 114 (1963); *Parklawn v. Nee*, 243 Md. 249, 254, 220 A. 2d 563 (1966); *Rooney v.*

*Statewide Plumbing*, 265 Md. 559, 564, 290 A. 2d 496 (1972).

As aptly stated by Judge Powers, for the Court of Special Appeals, in *Knisley v. Keller*, 11 Md. App. 269, 272-3, 273 A. 2d 624 (1971), ". . . The function of the trial judge [in connection with a motion for summary judgment] is much the same as that he performs at the close of all the evidence in a jury trial when motions for directed verdict or requests for peremptory instructions require him to decide whether an issue requires resolution by a jury, or is to be decided by the court as a matter of law." See also *Rooney v. Statewide Plumbing, supra.*

In reviewing the propriety of the granting of a summary judgment our concern is primarily with deciding whether a factual issue does exist which is material to the resolution of the controversy. See *Brown v. Suburban Cadillac, supra; Rooney v. Statewide Plumbing, supra.* Where the record shows that there is no such genuine dispute as to any material fact necessary to resolve the controversy as a matter of law, and that the movant is entitled to judgment, the entry of summary judgment is proper. *S. L. Hammerman Organization, Inc. v. Community Health Facilities, Inc., supra.*

As a general rule constitutional questions are not to be dealt with abstractly and this court will not decide constitutional questions except when concrete and specific issues are raised by actual ones. See *Hammond v. Lancaster*, 194 Md. 462, 471, 71 A. 2d 474, 479 (1950) (Motion to Stay denied, 339 U. S. 908) ; *Tanner v. McKeldin*, 202 Md. 569, 580, 97 A. 2d 449, 454 (1953) ; *Givner v. Cohen*, 208 Md. 23, 37, 116 A. 2d 357, 363 (1955) ; *State v. Cherry*, 224 Md. 144, 167 A. 2d 328 (1961) ; *Board of Public Welfare v. Myers*, 224 Md. 246, 252, 167 A. 2d 765, 768 (1961). The provisions of the Uniform Declaratory Judgments Act (Art. 31A) have been invoked to obtain a declaration whether or not a statute is constitutional, when the complainant alleges that he will be directly damaged, in person or in property,

if the statute is enforced; that such enforcement will result in infringement of his constitutional rights and that the defendant, who is charged with the duty of enforcing the statute, is enforcing it, or is about to enforce it. *Davis v. State*, 183 Md. 385, 37 A. 2d 880 (1944) ; *Tanner v. McKeldin, supra; Liberto v. State's Attorney*, 223 Md. 356, 164 A. 2d 719 (1960) ; *Bruce v. Director, Dept. of Chesapeake Bay Affairs*, 261 Md. 585, 276 A. 2d 200 (1971).

In *State's Attorney v. Triplett*, 255 Md. 270, 257 A. 2d 748 (1969), and in *Hunt v. Montgomery County*, 248 Md. 403, 237 A. 2d 35 (1968), the summary judgment procedure was used in actions brought under the Uniform Declaratory Judgments Act to pass upon the constitutionality of statutes.

In *Triplett, supra,* Judge Barnes, for the Court, after pointing out that ". . . every presumption favors the validity of the statute and it will not be held to be unconstitutional and void unless it plainly contravenes a constitutional provision," stated:

"In our opinion, the Chancellor should not have granted a summary judgment declaring the Act unconstitutional as denying due process of law and the equal protection of the law. There may be cases involving statutes where the denial of due process of law and of equal protection of the law are clear *on the face of the statutes or upon consideration of quite limited evidence,* but, in our opinion, the statute involved in the present case is not of this type, especially in view of the issues arising in regard to the possible restrictive effect of the provisions of the title of the Act upon the construction of the language in the body of the Act." (Emphasis supplied) [255 Md. at 285-6, 257 A. 2d at 755.]

In *Hunt v. Montgomery County, supra,* a bill for declaratory relief was heard on demurrer, by agreement of the parties; a declaratory decree was entered declaring

the rights of the parties and entering judgment for the defendants without the demurrer having been ruled upon. We noted there that since there was no genuine dispute of fact, and as the answer to the contentions turned solely on questions of law, the declaration entered by the court could be treated as a summary judgment. Chief Judge Hammond, after citing Borchard, *Declaratory Judgments,* 369-70 (2d Ed. 1941), stated:

"Borchard, *op. cit.* p. 432, says further:

"A question has been raised by a series of cases in New York, whether a motion to dismiss a complaint or a motion for judgment on the pleadings may be entertained and granted in an action for a declaratory judgment, or whether, as in *Neubeck v. McDonald* [220 N.Y.S. 761], the trial court, in the exercise of its discretion, should refrain from entertaining such a motion until the trial shall have clarified the facts and enabled the court to determine whether the complaint has any basis in fact or law. Since such motions are entertained in actions for coercive relief, there is no reason whatever why they should be rejected in declaratory actions. *Where motions are granted it indicates that the court* either finds no 'cause of action' or lacks jurisdiction or *can decide on the face of the pleadings, without the taking of evidence, that either plaintiff or defendant is right,* a decision which is appealable. On the other hand, where the court refuses to entertain or grant the motion, it is apparent that the court is unable to determine the issue presented by the motion on the complaint or the pleadings and wishes to hear evidence from both sides before making up its mind. *There is no basis, therefore, for the suggestion that the declaratory action in this respect differs from any other proceedings.*"

"In the case before us we think Judge Clapp

permissibly found that there was no genuine dispute of fact and that the answer to the contentions of the parties turned solely on questions of law which the parties had agreed to submit to the court. This being so, there was every reason to declare how the controlling law governed the essentially undisputed facts. *American Auto Ins. Co. v. Indemnity Co.* (E. D. Pa.), 108 F. Supp. 221, *aff'd* 228 F. 2d 622.

"The appellant's present claim that there existed a genuine factual dispute is inaccurate. There is no dispute as to the operative facts which led to the filing of the petition and which are therein alleged. The claimed dispute is as to legislative and administrative history, and the only facts as to these proffered are not challenged by the appellees and, as we indicated earlier, lend as much support to the appellees' interpretation of the statutes as they do to that of the appellants." [248 Md. at 413-414, 237 A. 2d at 40.]

Although the appellants alleged in their petition that "since 1935, by its rules and regulations," the Board has allowed the schools to reflect in their clinic charges the cost of administration, including the cost of materials, and alleged in their Motion for Summary Judgment that such charges "were approved by regulation and practice of the Board," no copies of any such purported rules or regulations were filed as exhibits accompanying their petition or Motion. Indeed, we take judicial notice, as we did in *Wrenn v. Vincent et Vincent of Langley, Inc.*, 235 Md. 466, 201 A. 2d 768 (1964) (involving an identical contention), that no such rules or regulations have as yet been filed with the Clerk of the Court of Appeals pursuant to the provisions of Art. 41, § 9 and § 246 of the Annotated Code. In *Wrenn, supra,* we stated:

". . . We may note that Code, 1963 Supp. Art. 43, § 548, empowers the State Board of Cosme-

tologists to 'prescribe such sanitary and safety rules as it may deem necessary, with particular reference to the precautions necessary to be employed to prevent the creating and spreading of infectious and contagious diseases,' and that Code 1957, Art. 43, § 544, gives the Board power to 'prescribe reasonable rules * * * generally for the conduct of persons * * * affected by this subtitle.' We may take judicial notice that no rules under this provision (or its statutory precursors) have been filed with the Clerk of the Court of Appeals pursuant to Code, 1957, Art. 41, §§ 9 and 246." [235 Md. at 470, n. 2, 201 A. 2d at 770.]

The appellants' reliance upon the alleged existence of rules and regulations of the Board, to say the least, is misplaced.

It must additionally be pointed out that the parties in their Cross-Motions for Summary Judgment each represented to the court that there was "no genuine dispute as to any material facts in this matter." [7] The Chancellor, in his memorandum, stated: "All parties having assured the court, both in their oral arguments and Memoranda, that there is no genuine dispute as to any material fact, disposition is forthwith made upon those Motions." [8]

The actions of an attorney within the scope of his employment are binding upon his client under the ordinary principles of agency. *McGinnis v. Chance*, 247 Md. 393, 399-400, 231 A. 2d 63, 67 (1967) ; *Bob Holding Corp. v. Normal Corp.*, 223 Md. 260, 164 A. 2d 457 (1960) ; 7 C.J.S., *Attorney and Client*, § 79 (1937) ; and 7 Am.Jur.2d, *Attorneys-at-Law*, § 100 (1963). This is particularly true concerning the stipulation of counsel in open court. See *Posko v. Climatic Control Corp.*, 198 Md. 578, 84 A. 2d 906 (1951) ; citing *Bloom v. Graff*, 191 Md. 733, 737, 63 A. 2d 313, 315 (1949) ; 9 *Wigmore, Evidence*

---

7. Appellants' Motion (R. 30), Board's Motion (R. 35).
8. Memorandum (R. 69).

(3d ed.), § 2594; 2 *Jones, Evidence* (2nd ed.), pp. 1759, 1761.

The affirmative representation by appellants' counsel in the trial court that there was "no dispute as to any material facts" and the concessum thereon is determinative of this contention.[9]

Notwithstanding the lack of evidence of the promulgation of such alleged "rules and regulations" relied on by the appellants, and notwithstanding the concessum that there was "no genuine dispute as to any material facts", our independent appraisal of the record convinces us that the resolution of whatever factual dispute may have been raised by the pleadings was not material to the legal issue, as to whether or not Art. 43, § 537 on its face was a valid exercise of the police power of the State. The pleadings and the Motions presented the lower court with a "concrete and specific issue." It was not error for the trial court, without the taking of testimony concerning the allegations made by the appellants to render summary judgment on the limited issue of the constitutionality of the Section on its face.

## (c) THE CONSTITUTIONALITY OF THE STATUTE

The appellants in their attack upon the constitutionality of Art. 43, § 537 (a), contend that it is an invalid exercise of the police power because it has no "relationship with the health, safety or welfare of the people"; that as a "price control" statute it imposes unreasonable and unnecessary restrictions arbitrarily interfering with private business and lawful occupations and that it is discriminatory in that no such equal restrictions are imposed "in the barber school clinics." The statute reads as follows:

> "§ 537. Student practice upon the public for pay prohibited
> (a) It shall be unlawful for any school of

---

9. See *Caviness v. State*, 244 Md. 575, 578, 224 A. 2d 417, 418 (1966), concerning waiver of objections in the trial court.

beauty culture to permit its students to practice beauty culture upon the public, under any circumstances, except by way of clinical work upon persons willing to submit themselves to such practice after having first been properly informed that the operator is a student and after the student has completed 500 hours of fundamental training. No school of beauty culture shall, directly or indirectly, charge any money whatsoever for treatment by its students and may charge only for the actual cost of materials used in such treatments but no charge shall be made for service supplie[s]." [10]

In *Allied American Mutual Fire Ins. Co. v. Comm'r of Motor Vehicles*, 219 Md. 607, 150 A. 2d 421 (1959), Judge Hammond (later Chief Judge) concisely defined the "police power" of the State. He stated:

". . . Essentially the police power of a state is no more than the power to govern. *Baltimore Gas Co. v. State Roads Comm.*, 214 Md. 266, 279; *Capital Transit Co. v. Bosley*, 191 Md. 502, 514. The power justifies regulations designed to promote the public convenience or the general prosperity, as well as those to promote public safety, health and morals, since it extends to the satisfying of great public needs and the promotion of the general welfare. *Maryland Coal and Realty Co. v. Bureau of Mines*, 193 Md. 627; *Bacon v. Walker*, 204 U. S. 311, 51 L. Ed. 499; *C. B. & O. Railway & Drainage Comm'rs*, 200 U. S. 561, 50 L. Ed. 596; *Nebbia v. New York*, 291 U. S. 502, 78 L. Ed. 940. The current thinking of the Supreme Court would seem to be illustrated by *Williamson v. Lee Optical Co.*, 348 U. S. 483, 99 L. Ed. 563, where the Court, in effect, held that state legislation, imposing reg-

10. See n. 4, *supra*.

ulations under the police power to correct an evil at hand, is valid if it might have been thought by the legislature that the particular measure was a rational way to correct it." [219 Md. at 616-7, 150 A. 2d at 427.]

See also *Bruce et al. v. Director, Dept. of Chesapeake Bay Affairs,* 261 Md. 585, 596, 276 A. 2d 200, 206 (1971).

The Legislature exercises a large discretion in determining what the public welfare requires, in what may be injurious to the general welfare of the public and also what measures are either necessary or appropriate for the protection and promotion of these interests. *A. & H. Transp., Inc. v. Mayor and City Council of Baltimore,* 249 Md. 518, 240 A. 2d 601 (1968); *Maryland Coal and Realty Co. v. Bureau of Mines,* 193 Md. 627, 69 A. 2d 471 (1949); *Davis v. State,* 183 Md. 385, 37 A. 2d 880 (1944).

The exercise by the Legislature of the "police power", of course, is subject to review by the courts, but the exercise of such power will not be interfered with unless it is shown to be misused or abused, or where it is shown to be exercised arbitrarily, oppressively or unreasonably. *Maryland Coal and Realty Co. v. Bureau of Mines, supra; McBriety v. City of Baltimore,* 219 Md. 223, 148 A. 2d 408 (1959); *Davis v. State, supra; Liberto v. Mayor and City Council of Baltimore,* 180 Md. 105, 23 A. 2d 43 (1941).[10a] The wisdom or expediency of a law adopted in the exercise of the police power of the state is not subject to judicial review and such a statute will not be held void if there are any considerations relating to the public welfare by which it can be supported. *Davis v. State, supra; State v. J. M. Seney Co.,* 134 Md. 437, 107 A. 189 (1919). Such a statute is presumed to be valid and one attacking its validity has the burden of affirmatively and clearly establishing its invalidity; every intendment is in favor of the validity of the statute where there is a

---

10a. In *Liberto v. Mayor and City Council, etc.,* we held that the regulation of the barbering business was within the police power of the State.

substantial relationship between its object and the means employed to attain that object. *Fuller v. County Commissioners of Baltimore County,* 214 Md. 168, 133 A. 2d 397 (1957) ; *Grant v. Mayor and City Council of Baltimore,* 212 Md. 301, 129 A. 2d 363 (1957). If any state of facts reasonably can be conceived that would sustain the constitutionality of the statute within the exercise of the police power, the existence of that state of facts as a basis for the passage of the law must be assumed. *Gino's v. Baltimore City,* 250 Md. 621, 637, 244 A. 2d 218, 227 (1968) ; *Eutaw Enterprises v. Baltimore City,* 241 Md. 686, 693, 217 A. 2d 348, 353 (1966).

In *Dobres v. Schwartzman et al.,* 191 Md. 19, 59 A. 2d 684 (1948), in holding that the Baltimore City Zoning ordinance prohibited the operation of a beauty parlor in a residential-use district and in affirming the action which denied the appellant such use, we stated that the provisions of Art. 43, §§ 471-496 (1939 Code) [11] were a proper exercise by the Legislature of its "police power".[12]

The Supreme Judicial Court of Maine had before it in *Maine Beauty Schools, Inc. v. State Board of Hairdressers,* 225 A. 2d 424 (Me. 1967), the precise issue here raised—the constitutionality of a 1965 amendment to the Maine statutes which prohibited the making of any charge by schools of hairdressers and beauty culture for the services by student operators and prohibited such schools from making any charges other than the reasonable cost of supplies and materials. The court recognized that ". . . The health, safety and welfare of the public is concerned from standpoints of sanitation, minimization or spread of communicable diseases and professional and technical competence of those who propose to practice the profession."

The court observed that the Legislature was confronted

---

11. Now Art. 43, §§ 529-555, Ann. Code (1971 Repl. Vol.).
12. See also the *dictum* in *Aitchison v. State,* 204 Md. 538, 550, 105 A. 2d 495, 501 (1954), that the licensing requirements for hairdressers, beauty culturists and trichologists was within the police power.

with contentions by school operators that the economics of their operation did not permit tuition charges to their students to be sufficient to operate the schools, without income from such "practical demonstrations," as a result of which, the public was invited to come to such schools for beauty work, performed by students, and received such services for a charge less than that made for comparable services by registered public beauty shops; and that the registered shops contended that such practice on the part of the schools was in effect the operation of "cut-price" beauty shops, making the profit motive on the part of such schools prejudicial to both student training and the industry. It was also noted that under the practice of treating the "model"—the patron-customer at the school—reduced the amount of constructive criticism between the instructor and the student to the detriment of the student and that this aspect of the school operation reduced the competence of its graduates to the detriment of subsequent licensed employers and of the graduating students themselves when they attempted to become independent operators.

In holding that: "Our statute is not *per se* constitutionally unequal and discriminatory in application, and the establishment and posting of 'the reasonable cost of supplies and materials used' to govern the charge to the 'model' is valid," the court pointed out in its opinion:

"Emphasis on vocational training on the one hand and emphasis as a business enterprise on the other need not be irreconcilable, but if the legislature has found that it is, it is within its prerogative. . . . [d]uring the legislative course of this proposition, that body concluded that service to the public by these schools without price control was detrimental to the student training and ultimate competence. It follows from such finding that the public interest in its exposure to the abundance of beauty aids on the market, many of which involve personal injury where

inexpertly applied, is a matter of health, safety and welfare." [225 A. 2d at 428] [13]

In *Toebe Academy of Beauty Culture, Inc. v. Kelly, et al.*, 239 Wis. 103, 300 N. W. 476 (1941), the Supreme Court of Wisconsin was called upon to rule on the lawfulness and reasonableness of an order promulgated by the State Board of Health which prohibited schools of cosmetology from charging patrons more than the reasonable cost of materials used.

The Wisconsin statute provided: "A school shall provide its students with subjects for practical work. The charge made for materials used shall not exceed the reasonable cost thereof. No school shall advertise for patrons to be used at the clinical work." In implementation of the statute the Board of Health issued an order that: "No school may charge a patron more than the reasonable cost of materials used" and set up a list of services and a determination of "reasonable cost of materials consumed in the rendition of each [such] service." The rule also provided that any school might apply to the Board for an order establishing other maximum amounts of "cost of materials" upon furnishing adequate proof that the cost of the materials used by them did exceed those set by the rule.

That court, after observing that "If a beauty school, so-called, practices cosmetic art it becomes a beauty parlor, the services being rendered by the students rather than by operators and apprentices," and after pointing out that by statute no person shall engage in the practice of cosmetic art unless he or she has been licensed by the Board to do so, stated in its opinion:

"It is considered that the chapter in question as applied to the teaching of cosmetic art is not

13. The court did uphold the issuance of an injunction against the use by the Board of a promulgated list of "reasonable costs" of supplies since the Board had not considered *all* the products shown to have been used by the schools.

As pointed out, *supra*, the Chancellor in these proceedings referred to the Board the issue of the promulgation of rules and regulations by which the "cost of materials" may be determined.

a price fixing statute. The power to fix the price
of materials used is an exercise of police power
to prevent imposition upon the public and eva-
sions of the provisions of the statute. The
schools of cosmetic art are not engaged in the
business of selling materials, they are engaged
in qualifying students to become practitioners of
the art. There seem to be many sound reasons
for requiring schools of cosmetic art to remain
within their particular field in the exercise of
the power of the state to promote the health,
safety and general welfare of the public." [239
Wis. at 110, 300 N. W. at 479-80]

In *Schwarze v. Clark, et al.*, 188 Okla. 217, 107 P. 2d
1018 (1940), the Supreme Court of Oklahoma held that
a rule promulgated by the State Board of Barber Ex-
aminers which provided that barbering students shall
not be allowed to charge any compensation, directly or
indirectly, for services rendered by them as students in
any barber school or college was not capricious, arbi-
trary, unreasonable or oppressive, and did not abridge
the constitutional rights of the owners of such barbering
schools or colleges. In discussing the reasoning behind
the adoption of the rule the court stated:

". . . [w]hen a student performs any of the
enumerated practices 'for payment either di-
rectly or indirectly,' he is undertaking the prac-
tice of barbering and is subject to the laws re-
lating to the barber profession which, among
other things, forbids the practice of said profes-
sion without a certificate. . . . To hold the rule
unreasonable would be to allow unlicensed stu-
dents to perform services of the same kind,
though perhaps not of as high a quality, as those
of licensed barbers, without complying with
statutory provisions governing such work. With
such a rule, the compensated service of the stu-

dent becomes amenable to the same regulations which apply to services of the licensed barber." [188 Okla. at 218, 107 P. 2d at 1020]

In *State v. Conragan, et al.,* 54 R. I. 256, 171 A. 326 (1934), the trial court certified to the Supreme Court of Rhode Island the issue of the constitutionality of a 1932 amendment to their statutes which provided: "No barber school shall charge any fee, price or compensation for any work or service performed in said school except the regular charge for tuition." In holding that the statute was not in violation of either the Constitution of Rhode Island nor the Fourteenth Amendment to the United States Constitution, the court noted in its opinion:

". . . [I]t is clear that the statute does not deprive them of their property by prohibiting them from charging customers for services rendered by their students. Students in a school are prohibited from barbering for compensation. The proprietor of a barber school has no more right to receive compensation for the service performed by a student than has the student. The statutory provision to which objection is made is reasonable and is necessary to insure to the public protection from untrained and unauthorized barbers." [54 R. I. at 259, 171 A. at 327.]

In *Mansfield Beauty Academy, Inc. v. Board of Registration of Hairdressers,* 326 Mass. 624, 96 N.E.2d 145 (1951), the Supreme Judicial Court of Massachusetts had before it a statute which prohibited any beauty school from making *any* charge—for either services or materials. That court, stating that it could find "no rational connection between the promotion of public health and the interdiction of such a charge", held the statute unreasonable and void insofar as it prohibited *any* charge

for the materials furnished to models by the schools.[14] The Massachusetts statute was amended in 1958 by striking the prohibition against charges for materials used. See *Maine Beauty Schools v. State Board of Hairdressers, supra,* at 429. A prohibition against the making of *any* such charges was enacted by the Maryland Legislature in 1935, as hereinabove noted; it was amended in 1947 to allow for the "actual cost of materials used", but continued the prohibition against any charge for services rendered by the student.[15]

In both *Moler v. Whisman,* 243 Mo. 571, 147 S. W. 985, 40 L.R.A., N.S. 629 (1912), and *State, ex rel Mitchell v. Thompson's School of Beauty Culture, Inc.,* 226 Ia. 556, 285 N. W. 133 (1939), statutes which prohibited the making of any charge by students or apprentices, respectively in barber colleges and in schools of cosmetology, were held to be unconstitutional in that they were held to violate respectively provisions of the Missouri Constitution (Art. 2, § 4) and of the Iowa Constitution (Art. 1, §§ 1 and 9), and are here inapposite in view of the lack of any similar provisions in our State Constitution.

Similarly, the holdings in *Ex Parte Kazas,* 22 Cal. App. 2d 161, 70 P. 2d 962 (1937), *Edwards v. State Board of Barber Examiners,* 72 Ariz. 108, 231 P. 2d 450 (1951) and *Duncan v. City of Des Moines,* 222 Ia. 218, 268 N. W. 547 (1936), are equally here inapplicable since each declared unconstitutional statutes which undertook to establish *minimum* prices which licensed barbers could charge for their services.

The nature of the work encompassed within the definition of "beauty school" as set forth in Art. 43, § 529 (a), *supra,* involving as it does contact with the human face and scalp, the exposure of the public to the use of dyes, chemicals, bleaching and coloring agents, as well

---

14. See also *Philadelphia School of Beauty Culture v. State Board of Cosmetology,* 78 Pa. D & C 111 (1951), involving the prohibition against making "any charge for the reasonable cost of materials."

15. See ch. 704, Acts of 1947, *supra,* n. 4.

as the removal of unwanted hirsute adornment by the use of mechanical or electrical appliances—the use of many of which may involve personal injury if not expertly applied—is patently affected with sufficient public interest to bring the practice of such artisans within the ambit of the police power of the State in order to protect and promote the public health and safety of the citizenry.[16]

Beauty schools by virtue of their very nature, their curriculum, training and the supervision of their students in clinics, determine the skill and expertise of those who, after licensing and registration, will, in the future, hold themselves available to the public for the performance of these services. It goes without saying that the educational and training procedures for the practice of cosmetology is equally clothed with a public interest.

In enacting the statute here under attack the Legislature, in the interest of the training of potential cosmetologists, has undertaken to restrict the schools of beauty culture to the primary function for which they are licensed by law—a concentration on the training of the students enrolled. By undertaking to limit the charges which the schools can make to the "model" to the cost of materials used, the model is more readily aware not to expect a semi-professional result from a student-trainee. The obligation of attempting to please the "model" is removed and a freer exchange of criticism and instruction is encouraged between the student and the supervisor.

As we noted in *Gino's v. Baltimore City, supra,* and in *Eutaw Enterprises of Baltimore City, supra,* it must be assumed that there existed before the General Assembly a state of facts similar to that noted in *Maine Beauty Schools, Inc. v. State Board of Hairdressers, supra,* as a basis for the enactment of Art. 43, § 537 (a).

The Legislature obviously concluded that the service

---

16. See *Wrenn v. Vincent et Vincent of Langley, Inc., supra,* involving a claim for damages from the alleged application of a bleach and dye. See also *Dobres v. Schwartzman, et al., supra.*

to the public by beauty schools without restriction on the nature of the charges which could be made was detrimental to the training of students and their ultimate competence. Emphasis on vocational training on the one hand and a business enterprise on the other, need not necessarily be irreconcilable, but if the Legislature has found it to be, it is within its legislative prerogative.

In view of the prohibition against the practice of cosmetology without examination, licensing and registration (see Art. 43, §§ 530, 531) and in view of the prohibition (Art. 43, § 538) against the practice of beauty culture in other than a registered beauty shop, the reasoning in *Schwarze v. Clark, et al., supra,* becomes particularly pertinent in that the beauty schools, save for such a prohibition would be entitled to charge—indirectly at least—for cosmetology services performed by unlicensed students and would circumvent the prohibition against the practice of beauty culture in other than a registered beauty shop. The prohibition in Art. 43, § 537 (a), against making any charge whatsoever for the clinical work performed by students in the beauty schools has a substantial direct relationship with the health, safety and welfare of the public, and thus, on its face, is within the police power of the state.

That the statute may undertake indirectly to, control prices and affect competition does not *per se* render it invidious or unconstitutional; such a form of regulation is unconstitutional "only if arbitrary, discriminatory or demonstrably irrelevant to the policy the Legislature is free to adopt and hence an unnecessary and unwarranted interference with individual liberty." See *Nebbia v. New York,* 291 U. S. 502, 538-9, 54 S. Ct. 505, 78 L. Ed. 940 (1934), cited with approval in *Allied American Mutual Fire Insurance Co. v. Comm'r of Motor Vehicles, supra,* where it was recognized that "The [police] power justifies regulations designed to promote the public convenience or the general prosperity, as well as those to promote public safety, health and morals, since it extends

to the satisfying of great public needs and the promotion of the general welfare."

In *Nebbia, supra,* the U. S. Supreme Court upheld, as within the exercise of the police power of the state, the constitutionality of the New York Milk Act which made it unlawful to sell or to buy milk at a price less than, or more than, that fixed by regulation. After pointing out that "legislation concerning sales of goods and incidentally affecting prices has repeatedly been held valid." [17]

The court stated in its opinion:

"So far as the requirement of due process is concerned, and in the absence of other constitutional restriction, a state is free to adopt whatever economic policy may reasonably be deemed to promote public welfare, and to enforce that policy by legislation adopted to its purpose. The courts are without authority either to declare such policy or, when it is declared by the legislature, to override it. If the laws passed are seen to have a reasonable relation to a proper legislative purpose and are neither arbitrary nor discriminatory, the requirements of due process are satisfied and judicial determination to that effect renders a court *functus officio* . . . and it is equally clear that if the legislative policy be to curb unrestrained and harmful competition by measures which are not arbitrary or discriminatory, it does not lie with the courts to determine that the rule is unwise . . . ." [291 U. S. at 537.]

See also *Williamson, etc. v. Lee Optical Co.,* 348 U. S. 483, 488, 75 S. Ct. 461, 99 L. Ed. 563 (1955).

The holdings in *Jay Burns Baking Co. v. Bryan, etc.,* 264 U. S. 504, 44 S. Ct. 412, 68 L. Ed. 813 (1924), cited by appellants, are not contrary to these recognized principles; nor are the holdings in *Williams v. Standard Oil*

17. 291 U. S. at 529.

*Co.,* 278 U. S. 235, 49 S. Ct. 115, 73 L. Ed. 287 (1929), here persuasive, since the Tennessee statute there involved undertook affirmatively to fix the prices at which gasoline might be sold within that State.

In *Blum v. Engelman,* 190 Md. 109, 57 A. 2d 421 (1948), we upheld the constitutionality of the "Unfair Sales Act" [18] which made it unlawful to sell merchandise at less than cost with the intent to injure a competitor or to destroy competition. Judge Delaplaine, who delivered the opinion of the Court, stated:

> ". . . It is only when the object of price-cutting is sinister that the sale of goods at less than cost may constitute an economic evil. Freedom of contract is subject to legislative regulation in the interest of public health, safety, morals or welfare. But such legislation must not be unreasonable, arbitrary, or capricious, and the means selected must have a real and substantial relation to the object sought to be attained. Within these limitations the State is free to adopt whatever economic policy may reasonably be deemed to promote public welfare, whether by promoting free competition by statutes aimed at monopolies or by curbing harmful competition by fixing minimum prices. *Daniel Loughran Co. v. Lord Baltimore Candy & Tobacco Co.,* 178 Md. 38, 44, 12 A. 2d 201. It is our conclusion that the Unfair Sales Act, prohibiting sales below cost with intent to injure competitors and to destroy competition, promotes a policy within the police power of the State." [190 Md. at 115.] [19]

We have also upheld the constitutionality of the Mary-

---

18. Now codified as Art. 83, § 111-115, Ann. Code (1969 Repl. Vol.).

19. See, however, *Cohen v. Frey & Son, Inc.,* 197 Md. 586, 80 A. 2d 267 (1951), concerning the application of § 112, as embodied in § 113, to the parties therein, all of whom were "wholesalers".

land "Fair Trade Act".[20] See *Goldsmith v. Mead Johnson and Co.,* 176 Md. 682, 7 A. 2d 176 (1939) ; *Schill v. Remington Putnam Book Co.,* 179 Md. 83, 17 A. 2d 175 (1941) ; *Home Utilities Co. v. Revere,* 209 Md. 610, 122 A. 2d 109 (1956).

In *Davis v. State,* 183 Md. 385, 37 A. 2d 880 (1944), in upholding the constitutionality of Ch. 600 of the Acts of 1943 enacted for the regulation of advertising by physicians and surgeons, we held that "The Legislature had the right to determine, and did determine, that the public interest would be injuriously affected by unseemly competition of physicians and surgeons for patients without any restraint as to methods, and that regulation of advertising by them is necessary for the public health, morals, or welfare."

Although the effect of the prohibition in Art. 43, § 537 (a), may be to undertake to limit competition between the beauty schools and registered beauty shops, the Legislature was free to adopt such an economic policy so long as it appeared reasonably necessary to protect the public welfare. As applied to the teaching of cosmetic art the statute is not a price-fixing statute; the proprietors of beauty schools have no more right to charge or to receive compensation for the services performed by their students than the unlicensed, unregistered students themselves could charge. The schools are not engaged in the business of supplying services to the public, but are engaged in qualifying students to become practitioners of the art; to permit such schools to make charges for the services supplied by their students would result in the operation of "cut-rate", unregistered beauty shops and would be inconsistent with the primary function of such schools—the education and training of those pursuing this vocation. We cannot say, to the extent it may "control prices" or affect competition, that the statute is unreasonable or that it does not bear a real and

---

20. Now codified as Art. 83, §§ 102-110, Ann. Code (1969 Repl. Vol.).

substantial relationship to the object sought to be attained—the regulation of the training of students of cosmetology and the protection of the general public who might come to expect a certain expertise if a charge for services was not prohibited.

Nor is the statute in its application to schools of beauty culture arbitrary or discriminatory. If all persons who are in like circumstances or affected alike are treated under the laws the same, there is no deprivation of the equal protection of the law. Conversely, a law which operates upon some persons or corporations, and not upon others like situated or circumstanced or in the same class is invalid. See *Oursler v. Tawes*, 178 Md. 471, 483, 13 A. 2d 763, 768 (1940) ; *Leonardo v. Board of County Commissioners*, 214 Md. 287, 304, 134 A. 2d 284, 292 (1957), *cert. denied* 355 U. S. 906, 78 S. Ct. 332, 2 L.Ed.2d 260, *rehearing denied* 355 U. S. 967, 78 S. Ct. 534, 2 L.Ed.2d 543; *National Can Corp. v. State Tax Commission*, 220 Md. 418, 431, 153 A. 2d 287, 295 (1959), *appeal dismissed* 361 U. S. 534, 80 S. Ct. 586, 4 L.Ed.2d 538.

In support of appellants' contentions that the statute is arbitrary and discriminatory their reliance upon our holdings in *Bruce v. Director, Dept. of Chesapeake Bay Affairs*, 261 Md. 585, 276 A. 2d 200 (1971), is misplaced. In *Bruce* we held unconstitutional certain sections of Art. 66C of the Maryland Code (1970 Repl. Vol.) which placed residential requirements and territorial restrictions on the licensing of commercial fishermen and watermen engaged in the tidal waters of Maryland. The statutes restricted such pursuits to the county of one's residence. In holding that the statutes in question were invalid in that they represented "an unreasonable exercise of police power" we observed that they created "an unlawful classification of persons" and a discrimination between the residents of the various counties; we nonetheless recognized that "the constitutional need for equal protection does not shackle the Legislature. It has the widest discretion in classifying tnose who are regulated and taxed. Only if the group is without any reasonable basis,

and so entirely arbitrary, is it forbidden . . ." [261 Md. at 601-2].

The appellants' contention further that the statute is discriminatory in that it does not apply to barber schools overlooks the prohibition set forth in Art. 43, § 318B (b), against the receipt of any remuneration by a student performing barbering work at a barber school. Since the statutory prohibition here in question applies equally to every school of beauty culture within the State it is not unconstitutionally arbitrary or discriminatory.

We are not here confronted with the issue of the reasonableness of any formula by which the "cost of materials" might be determined since the Chancellor remanded that issue to the Board for the promulgation of rules and regulations pertaining to the computation of "cost of materials".

### (d) ESTOPPEL—LACHES

The appellants, apparently conceding the constitutional validity of the statute, as their last thrust, contend that the Board should be estopped, or barred by laches, from attempting to enforce its provisions "by virtue of prior rules, regulations and policy of the Board."

As heretofore pointed out, we took judicial notice that no such rules or regulations have been filed with the Clerk of the Court of Appeals, pursuant to the provisions of Art. 41, § 9 and § 246 of the Annotated Code.[21] We must thus conclude that no such rules or regulations were ever promulgated. The record here is devoid of any evidence of a purported policy on the part of the Board, other than the inevitable conclusion that, notwithstanding the existence of the statutory prohibition since 1947, no attempt had been made, prior to March 6, 1962, by the members of former Boards, to enforce its provisions due solely to inaction.

---

21. *Wrenn v. Vincent et Vincent of Langley, Inc., supra.* See also *Maryland Tobacco Growers Ass'n v. Maryland Tobacco Authority,* 267 Md. 20, 296 A. 2d 578.

Judge Barnes for the Court in *Savonis v. Burke,* 241 Md. 316, 216 A. 2d 521 (1966), succinctly reviewed the doctrine of "equitable estoppel" as follows:

"Pomeroy, in his *Equity Jurisprudence* (5th ed., vol. 3), § 804, page 189 defines equitable estoppel as follows:

'Equitable estoppel is the effect of the voluntary conduct of a party whereby he is absolutely precluded, both at law and in equity, from asserting rights which might have otherwise existed, either of property, or contract or of remedy, as against another person who has in good faith relied upon such conduct, and has been led thereby to change his position for the worse and who on his part acquires some corresponding right, either of property, of contract, or of remedy.'

"We have adopted and have continually applied this definition of equitable estoppel. *Bayshore Industries v. Ziats,* 232 Md. 167, 175, 192 A. 2d 487, 492 (1963) ; *Webb v. Johnson,* 195 Md. 587, 595, 74 A. 2d 7, 10 (1950) ; *Crane Co. v. Onley,* 194 Md. 43, 50, 69 A. 2d 903, 906 (1949) and the prior cases cited therein.

"Equitable estoppel operates as a technical rule of law to prevent a party from asserting his rights where it would be inequitable and unconscionable to assert those rights. *Fitch v. Double "U" Sales Corp.,* 212 Md. 324, 339, 129 A. 2d 93, 101 (1957) ; *Wright v. Wagner,* 182 Md. 483, 492, 34 A. 2d 441, 446 (1943) ; *Rody v. Doyle,* 181 Md. 195, 29 A. 2d 290 (1942). It is essential for the application of the doctrine of equitable estoppel that the party claiming the benefit of the estoppel must have been misled to his injury and changed his position for the worse, having believed and relied on the *rep-*

*resentations* of the party sought to be estopped. *Food Fair v. Blumberg*, 234 Md. 521, 532, 200 A. 2d 166, 172 (1964) ; *Solomon's Marina v. Rogers*, 221 Md. 194, 198, 156 A. 2d 432, 434-435 (1959) ; *Alvey v. Alvey*, 220 Md. 571, 576, 155 A. 2d 491, 493 (1959) ; *Liberty Mut. Ins. Co. v. American Auto Ins. Co.*, 220 Md. 497, 501, 154 A. 2d 826, 828 (1959) ; *Hamlin Mach. Co. v. Holtite Mfg. Co.*, 197 Md. 148, 159, 78 A. 2d 450, 455 (1951) ; *Brenner v. Plitt*, 182 Md. 348, 364, 34 A. 2d 853, 861 (1943) ; *Rodgers v. John*, 131 Md. 455, 102 Atl. 549 (1917). . . ." (Emphasis supplied) [241 Md. at 319-20.]

See also *Chertkof v. Philadelphia, Baltimore and Washington Railroad Co.*, 254 Md. 557, 255 A. 2d 14 (1969).

As was held in *Lipsitz v. Parr*, 164 Md. 222, 164 A. 743 (1933), laches is an inexcusable delay, without necessary reference to duration, in the assertion of a right, and, unless mounting to the statutory period of limitations, mere delay is not sufficient to constitute laches, if the delay has not worked a disadvantage to another. See *Bradford v. Futrell*, 225 Md. 512, 525, 171 A. 2d 493, 500 (1961). "The doctrine of laches is an application of the general principles of estoppel." *Oak Lawn Cemetery v. Baltimore County*, 174 Md. 280, 291, 198 A. 600, 605 (1938), citing *Pomeroy's Eq. Juris.* Vol. 4, § 1440. See also *Boehm v. Boehm*, 182 Md. 254, 269, 34 A. 2d 447, 454 (1943). Prejudice or injury to the party raising "laches" is an essential element. *Simpers v. Clark*, 239 Md. 395, 403, 211 A. 2d 753, 757 (1965). So long as the position of the parties is not changed and there is no prejudice from the delay laches are inapplicable. *Oak Lawn Cemetery v. Baltimore County, supra.*

Although it is recognized that estoppel may operate against the State by acts done in its proprietary capacity, the doctrine of estoppel will not be applied against the State in the performance of its governmental, public or sovereign capacity or in the enforcement of police mea-

sures. 28 Am.Jur.2d, *Estoppel and Waiver,* § 123, § 124; 31 C.J.S., *Estoppel,* § 140 (b).

In *Comptroller v. Atlas Industries,* 234 Md. 77, 198 A. 2d 86 (1964), the appellant sought to invoke the doctrine of estoppel based upon the contention that the "delay" from 1954 until 1961 in demanding the payment of sales taxes was because the "previous administration 'did not care to force the issue'—but the present administration did." Judge Prescott (later Chief Judge), concerning this contention, stated:

> "It seems to be universally recognized that, generally, a State cannot be estopped by the acts and conduct of its officers or agents in the performance of the governmental function of collecting taxes legally due. The reason for the rule is obvious: no administrative officer is vested with the power to abrogate the statute law of the State, nor to grant to an individual an exemption from the general operation of the law. *United States v. Globe Indemnity Co.,* 94 F. 2d 576 (C. A. 2); *Olson Const. Co. v. State Tax Comm.,* 361 P. 2d 1112; *Henderson v. Gill, supra; Michigan Sportservice Inc. v. Nims,* 30 N.W.2d 281 (Mich.); *Claiborne Sales Co. v. Collector of Revenue,* 90 So. 2d 345 (La.); *Comm. v. Western Md. R. R. Co., supra;* 31 C.J.S., *Estoppel,* § 138; 19 Am.Jur., *Estoppel,* § 166; Bigelow, *Estoppel* (6th Ed.), p. 372; 1 *Cooley Taxation,* p. 159 Cf. *Gontrum v. City of Baltimore,* 182 Md. 370, 35 A. 2d 128." [22] [234 Md. at 84-5.]

In *National Labor Relations Board v. Baltimore Transit Co.,* 140 Fed. 2d 51, 55 (1944) (4th Cir.), *cert. denied* 64 S. Ct. 848, it was similarly held that the principles of equitable estoppel cannot be applied "to deprive the public of the protection of a statute because of mistaken

---

22. See also *C. E. Weaver Stone Co. v. Comptroller,* 235 Md. 15, 22, 200 A. 2d 53 (1956).

action, or lack of action, on the part of public officials."
See also *Utah Power & Light Co. v. United States,* 243
U. S. 389, 409, 37 S. Ct. 387, 61 L. Ed. 791 (1916) ; An-
notations, 1 A.L.R.2d, pp. 341-346.

It is equally well settled that laches on the part of the
state in bringing suit is not a defense in a case which is
founded on the exercise of a sovereign right or the ex-
ercise of a governmental function. As it is sometimes
expressed, the mere acquiescence, laches, lapse of time
or non action on the part of the public agents or officers
will not be imputed to the government to work an es-
toppel. 27 Am.Jur.2d, *Equity,* § 156, 30A C.J.S., *Equity,*
§ 114, 31 C.J.S., *Estoppel,* § 138. See also *Thompson v.
United States,* 312 F. 2d 516 (Kan.) (10th Cir. 1962),
*cert. denied* 373 U. S. 912, 83 S. Ct. 1303, 10 L.Ed.2d
414.

This contention by appellants is similar to that raised
in *Atkinson v. Sapperstein,* 191 Md. 301, 60 A. 2d 737
(1948), wherein the appellee sought to have declared in-
valid the provisions of Art. 56, §§ 24 and 25 of the Code
of 1939, which required a license to be obtained by ice
cream vendors. One of his challenges to the constitution-
ality of the statute alleged that the statutes had been
"disregarded throughout the State by practically all the
law enforcement agencies charged with their enforce-
ment, not out of an intent to flout the pronouncements
of the Legislature, but because of their recognition that
the enactments are unreasonable and invalid." Judge
Collins, writing for the Court and in rejecting this con-
tention, stated:

> "In the case at bar the appellee is not con-
> tending for an interpretation of the statutes
> here in question. He is asking this Court to de-
> clare them null and void because he alleges that
> the law enforcement agencies have not enforced
> them. It is one thing to interpret a statute *ac-
> cording to the way it has been administered.*
> It is entirely a *different thing to declare a stat-*

*ute null and void on account of its total non-enforcement.* In *Arnreich v. State, supra,* the administrative authorities interpreted the statute there in question to exempt those who operated stalls in the markets. The provisions of the code here in question have been amended many times by the Legislature, as late as the year 1937. We cannot say, as was said in *Arnreich v. State, supra,* that the Legislature has acquiesced in an administrative declaration that these provisions are invalid. The instant case comes within the limitation of the rule set out in *Arnreich v. State, supra,* where the Court said at pages 105 and 106 of 150 Md., at page 436 of 132 A: "We are not unmindful of the limitation upon this rule as expressed in the case of *Smith v. State,* 134 Md. 473, [480], 107 A. 255, in which it was said: 'When the question is presented to it of a *laxity in enforcement,* or misconception of the intent of the law by administrative officers whose duty it was to carry out the act of the Legislature, such omission or misconception of clear statutory provisions *cannot* be allowed to stand in the way of giving to the act of the Legislature the proper interpretation.' This limitation, as thus expressed, is supported by the great weight of authority." (Emphasis supplied) [191 Md. at 312.]

See also *Brown v. State,* 177 Md. 321, 9 A. 2d 209 (1939), sustaining the action of the lower court in excluding evidence of previous failure on the part of the police in Baltimore to enforce the "Hawkers and Peddlers" license laws.

There is no evidence here of any "long standing and consistent administrative interpretation acquiesced in by the Legislature", but even if there were, since the language of the statute is clear and unambiguous any such administrative interpretation contrary to that clear and

unambiguous meaning could not be given effect. See *Atlantic, Gulf & Pacific Co. v. Dept. of Assessment and Taxation,* 252 Md. 173, 183, 249 A. 2d 180, 186 (1969) ; *Beneficial Finance Co., etc. v. Administrator of Loan Laws,* 260 Md. 430, 441-2, 272 A. 2d 649, 655 (1971).

Since the prohibition here under attack has been part of the statutory law of the State since 1947 and since the knowledge of that law is imputed to the appellants—and to all others [23]—they cannot here successfully contend that there has been "any change in the position of the parties" as a result of inaction on the part of predecessor Boards in enforcing compliance with the statute. Indeed, it appears that from 1962, when this litigation was instituted, up until the hearing of the respective Cross-Motions, the appellants undertook—unsuccessfully—to obtain legislative relief.

The statute, with its express prohibition, is self-enforcing. The only "policy" attributable to the Board on the record before us is one of inaction. Any such inaction or acquiescence by predecessor Boards in failing to call upon the appellants for enforcement of the statute cannot abrogate a statute which has been enacted in furtherance of the police power of the State. To hold otherwise would be to permit administrative officers of the State by inactivity or apathy to effectively bring about a repeal of a validly enacted statute and a resultant veto of a legislative enactment.

Since no formula has been adopted by the Board by rule or regulation as to what may be encompassed within the definition of the "cost of materials", the Chancellor properly retained jurisdiction over that subject-matter and remanded that issue to the expertise of the Board for the promulgation of such a rule or regulation.

The interlocutory injunction issued on April 10, 1963, served its office and purpose until the final decree was

**23.** See *Grumbine v. State,* 60 Md. 355 (1883) ; *Hopkins v. State,* 193 Md. 489, 69 A. 2d 456 (1949) ; *Flohr v. Coleman,* 245 Md. 254, 225 A. 2d 868 (1967).

issued; no order of dissolution was necessary to the validity of the decree here appealed. *Musgraove v. Staylor, Admr.,* 36 Md. 123, 128 (1872).

*Decree affirmed, the costs to be paid by appellants.*